ALASKA STATEBANK, Appellant,

v.

FAIRCO, a partnership d/b/a Clowntown, and James L. Dodson, Ronald M. Henry, and Andrew S. Warwick, Appellees.

No. 6720.

Supreme Court of Alaska.

Nov. 25, 1983.

David W. Oesting, Davis, Wright, Todd, Riese & Jones, Anchorage, and Mary A. Nordale, Fairbanks, for appellant.

James A. Parrish and Lance C. Parrish, Parrish Law Office, Fairbanks, for appellees.

Before BURKE, C.J., RABINOWITZ, MATTHEWS and COMPTON, JJ., and TUNLEY, Superior Court Judge.*

OPINION

RABINOWITZ, Justice.

In this case Fairco, the debtor, filed suit against Alaska Statebank (Statebank), the secured creditor, for damages allegedly sustained when Statebank proceeded against the collateral which secured Fairco's delinquent obligation to the bank. Fairco claimed that the course of negotiations between the parties had altered Statebank's rights under Alaska's version of the Uniform Commercial Code (UCC) and the written security agreement, precluding the bank from proceeding against the collateral without giving prior notice to Fairco. Statebank disputed Fairco's characterization of the effect of the negotiation process, relying upon the terms of the security agreement and the provisions of the Alaska UCC. After a nonjury trial the superior court ruled in favor of Fairco and this appeal followed.

I. FACTS

Fairco is a partnership formed by James L. Dodson, Ronald M. Henry and Andrew S. Warwick. Fairco owns and runs a retail store in the Bentley Mall in Fairbanks, operating under the tradename "Clowntown."

On February 2, 1977, Statebank loaned Fairco $120,000 with interest at 10¼.[1] A year later, in February 1978, Statebank made a second loan, in the amount of $50,000, to Fairco.[2] The security agreement given in connection with this $50,000 loan contained the following standard provision:

> If borrower shall fail to pay when due any amount payable on any of the loans made hereby or on any other indebtedness of Borrower's secured hereby, or shall fail to observe or perform any of the provisions of this agreement, Borrower shall be in default hereunder. When Borrower is so in default, all of such loans and other indebtedness secured hereby shall become immediately due and payable at Bank's option without notice to Borrower, and Bank may proceed to enforce payment of the same and to exercise any or all rights and remedies afforded to Bank by the Uniform Commercial Code of Alaska or otherwise possessed by Bank.

The $50,000 note stated it was payable on demand or in installments—$10,000 on June 15, 1978, $3,000 payments on September 15, October 15 and November 15, 1978, and the balance by December 15, 1978.

The June 15 payment on the $50,000 note was not made. A revision agreement, executed by the partners and Fosheim on June 30, 1978, provided that the $3,000 payments would be made as scheduled and that the balance would be due December 15, 1978. Thus, the $10,000 payment was postponed until the end of the year under the new contract but other provisions remained unaltered.

The September 15 payment on the $50,000 note was not made. On October 1, the delinquency came to the attention of John Houlihan, senior vice president of Statebank and Fosheim's supervisor regarding loan-making and collection. He arranged for transfer of the account to Anchorage.

---

* Tunley, Superior Court Judge, sitting by assignment made pursuant to article IV, section 16 of the Constitution of Alaska.

1. The loan was handled by Ivan Fosheim, a vice president and branch manager of Statebank at that time. The agreement was memorialized in a promissory note and a security agreement creating a security interest in Clowntown's inventory and accounts receivable. The loan was payable in monthly installments beginning in May 1977. The payments were made regularly, though they were untimely.

2. This transaction was also handled by Fosheim. The rate of interest was 11%, and the agreement was evidenced by a promissory note and a security agreement covering inventory and accounts receivable. Repayment was also secured by the guarantee of each partner.

The payment due on October 15, 1978 was not made. At this point, Houlihan obtained financial statements from Clowntown and discovered that it had insufficient income to pay its debts as they came due, that the original equity in the company had been eliminated by operating losses, and that the value of the collateral was diminishing more rapidly than the indebtedness to Statebank was being retired. Houlihan met with the partners on October 16 to discuss the delinquency. Fairco suggested that the Bank "roll" the note to delay repayment until after the Christmas selling season. Houlihan rejected the proposal and requested further financial information.[3]

Responsibility for the Fairco loans was assigned to Gerald Lewis, vice president of credit administration at Statebank, shortly after October 16.[4] On November 3, 1978, Lewis presented Fairco with a written proposal for granting the extension it sought for payment of the $50,000 loan. It required the partners to provide Statebank with deeds of trust on their personal residences as collateral for the note, stated that the note was in default, and extended repayment, $20,000 being due on January 15, 1979 and the balance on June 30, 1979. The deeds of trust were to be released upon payment in full of the $50,000 sum, provided that at that time the value of Clowntown's inventory exceeded its outstanding indebtedness to Statebank by 20%. The offer stated that it would expire at 1:00 p.m. on November 8, 1978.

Lewis contacted Henry and Dodson on November 6, 1978 and was informed that the partnership had agreed to a counterproposal. By its terms, Fairco's outstanding indebtedness to Statebank of $130,000 would be refinanced over a five-year period with monthly payments of $2,900 at 12% interest. The proposal offered no additional collateral. There is a conflict between the testimony of Lewis and Dodson regarding the verbal exchange which followed. Dodson testified that Lewis simply thanked Dodson and hung up. Lewis testified that he said "Is this the only thing that you are able to do?", indicated that the proposal would not be agreeable to Statebank, thanked him and hung up. The trial judge accepted Dodson's version, but concluded that neither account of the exchange constituted a notice of default or demand for payment.

It was at this point that Lewis decided to proceed against the collateral. On November 6 at 8 p.m., accompanied by Fosheim and two other representatives of the Fairbanks branch, a locksmith and a police officer, Lewis proceeded to Clowntown. He identified himself to the manager and informed him that the store was being closed. Customers were asked to leave, but were not informed why the store was being closed. According to two of the local Statebank representatives and two customers who were present, Lewis conducted himself with an air of self-importance and appeared to be "charged up" by the takeover. The locks on the store were changed and receipts and accounts secured. Statebank set off Fairco's checking account against the sum it owed the bank. Outstanding checks presented for payment were not accepted, and the payees were informed that the account had been "closed."

On the morning of November 7, Fairco retook possession of the collateral and opened the store. Statebank presented the partnership with a written demand for payment of the two notes. On November 8, the partners executed the agreement which had been proposed by Statebank on November 3. Fairco's account at Statebank was charged $822.45 for the title insurance policies purchased on the partners' residences

---

3. In a memorandum to the file composed after the meeting, Houlihan suggested that repayment be delayed until after Christmas, provided Statebank obtained proper collateralization to support the personal guarantees of the partners.

4. Lewis had been hired by Statebank in mid-September 1978. He contacted the partners and learned that Fairco was losing money at the rate of $6,000 per month and that the value of the Clowntown inventory was deteriorating without a commensurate reduction in Statebank's loans.

which partially secured the new agreement. No notice was given to the partners that this sum would be deducted from their account.

Fairco refinanced the loan at another institution and paid its obligation to Statebank in full on January 16, 1979. On January 25, 1979, the deeds of trust on two of the residences were released. After repeated demands from Henry the encumbrance on his house was finally released on June 7, 1979, two weeks after the instant suit was filed. Henry testified that Lewis admitted to him that Statebank was holding the deed of trust because of difficulties he was experiencing in repaying unrelated obligations, and that the failure to release it earlier had been an "oversight on purpose."

## II. PROCEEDINGS IN THE SUPERIOR COURT

Fairco filed suit against Statebank, alleging that the Bank had acted unreasonably in repossessing the collateral, damaging the partners' business and personal reputations and causing various unnecessary expenditures. Fairco argued that Statebank had breached the duty of good faith imposed by the Alaska UCC at AS 45.01.203 by closing the store in order to coerce the partners to put up additional security. Fairco sought both compensatory and punitive damages.

After a trial without a jury, the superior court concluded that by their course of dealing the parties had modified the contract to relieve Fairco of its obligation to pay sums due under the note. The court found that Fairco was not in default at the time Statebank took possession of its collateral and thus held that the breach did not give rise to remedies under the UCC and written security agreement. Alternatively, the superior court concluded that even if a default existed, Statebank had waived its right to seize the collateral or was estopped

to assert this right until after the Christmas selling season without making a prior demand for payment and giving notice of default. In failing to provide prior notice of its intention to take possession of the store, Statebank had, the superior court found, violated its duty under the UCC to conduct itself in good faith in its dealings with Fairco. Statebank was held liable for defamation in publicizing Fairco's justified failure to pay its debts and wrongfully dishonoring checks drawn on its account. Finally, the superior court found that Statebank had converted funds in Fairco's account by charging it for title insurance without giving the partners prior notice of its intention to do so.

Plaintiffs Henry and Warwick were awarded $3,000 and $10,000 respectively as compensatory damages for harm to their business reputations, and Fairco was awarded $4,800 for labor expended in correcting problems arising from the repossession, $822.25 for sums withdrawn to pay for the title insurance and $35,000 in exemplary and punitive damages. The superior court also awarded costs and attorney's fees. This appeal followed.

## III. STATEBANK'S STATUTORY AND CONTRACTUAL RIGHT TO PROCEED AGAINST ITS COLLATERAL WAS ABROGATED BY VIRTUE OF PRINCIPLES OF MODIFICATION, WAIVER AND ESTOPPEL

There is no dispute that payments due on the $50,000 note on September 15, 1978 and October 15, 1978 had not been made by November 6, 1978, when Lewis took possession of Clowntown. Thus, it is indisputable that Fairco was in default under the terms of the February 1978 written agreement, as revised.[5]

> If a debtor is in default under a security agreement, a secured party has the rights and remedies provided in AS 45.09.501–AS 45.09.507 and, except as limited by (c) of this section, those provided in the security agreement.

5. The Alaska UCC does not define "default," although remedies for a default are set out at AS 45.09.501–.507. Rather, a "default" is to be defined by the terms of the security agreement signed by the parties at the time the security interest is created. AS 45.09.501(a) provides, in relevant part:

■ The issue here is whether the oral statements and conduct of the parties between September 15, 1978 and November 6, 1978 had modified the written agreement so that prerepossession notice was required. Statebank argues that the conduct and statements of the parties were "mere negotiations" which did not result in an offer and acceptance and thus did not affect the legal relations established by the written agreement. In *National Bank of Alaska v. J.B.L. & K. of Alaska, Inc.,* 546 P.2d 579, 586–87 (Alaska 1976), we observed that modification of a written contract may be effected either through subsequent conduct or oral agreements. Whether a modification has occurred is a question of fact. The superior court found that the parties had agreed to such a modification, "[g]iven the course of dealings between the parties, the fact of the continued negotiation and the lack of outstanding demand for payment." [6] More particularly, the superior court, in part, found the following:

The partners left the October 16, 1978 meeting with the objectively and subjectively reasonable impression that Fairco would not be required to make payments on the $50,000 note until after the Christmas selling season.[7]

. . . .

By its conduct and course of dealing Alaska Statebank led the principals into believing that payments on the $50,000 note were not currently required and that no default existed. Fairco reasonably relied on that belief.

. . . .

Given the course of dealing between the parties, the fact of the continued negotiation and the lack of outstanding demand for payment, no default existed on either the $50,000 note or the $120,000 note on the date possession was taken. Even if a default on the $50,000 [note] did exist, Alaska Statebank waived the default and was further estopped to rely on any default as a ground for taking possession without first demanding payment or giving notice of default.

Our review of the record in the case at bar fails to persuade us that the superior court's findings of fact are clearly erroneous. Several courts on fact situations similar to that presented in the instant case have held that the course of dealings between the parties altered rights established under pre-existing agreements so that prerepossession notice was required. In the absence of such notice, a repossession was held to be wrongful. In *Nevada National Bank v. Huff,* 94 Nev. 506, 582 P.2d 364, 369 (1978), the court reasoned that:

[I]t is clear that even though no outright waiver of a secured party's right to rely upon [a clause in the agreement authorizing him to declare a default and repossess the chattel] occurs through a course of dealing involving the acceptance of late payments, a secured party who has not insisted upon strict compliance in the past, who has accepted late payments as a matter of course, *must,* before he may validly rely upon such a clause to declare a default and effect repossession, *give notice* to the debtor (lessee) that strict compliance with the terms of the contract

---

6. This determination may be reversed only if this court "arrive[s] at a definite and firm conviction, in light of the entire record, that [the] trial court was clearly mistaken." *Price v. S.S. Fuller, Inc.,* 639 P.2d 1003, 1008 (Alaska 1982).

7. Also of relevance here is the following finding of the superior court:

Although the specific terms and conditions of the $120,000 note required payments on the 10th of the month, in accordance with standard bank practice and the course of dealing with the partnership the bank consistently allowed payments by the 30th of the

month. By its acts and statements, the Bank modified the terms of the note such that the $120,000 note had not been delinquent or in default by virtue of payments being made between the 10th and 30th of the month. In any event, the November payment could not have been delinquent or in default at the time of taking possession, November 6, 1978, because even under the documents, the November payment was not due until November 10, 1978 . . . . The Court finds that at the time possession was taken, the $120,000 note was current.

will be demanded henceforth if reposses-sion is to be avoided.[8]

(Emphasis by the court.) Similarly, in *Pierce v. Leasing International, Inc.*, 142 Ga.App. 371, 235 S.E.2d 752 (1977), the court held that a creditor was estopped from repossessing its collateral without giv-ing the debtor notice that arrearages were immediately due and payable:

> [I]f [the creditor] has given the debtor the reasonable impression that late pay-ments will be accepted or that an arrear-age need not be paid immediately, then the creditor may be estopped to engage in self-help repossession until he has given notice, demanded payment or otherwise indicated to the debtor that he is con-sidered to be in default.

*Id.* at 754 (citations omitted).

On the basis of the foregoing, we affirm the superior court's conclusion that in the particular factual context of this case Sta-tebank's repossession and closure of the Clowntown store were wrongful.[9]

## IV. STATEBANK UNJUSTIFIABLY DELAYED IN RELEASING THE DEED OF TRUST ON HENRY'S PROPERTY

The agreement signed by Statebank and Fairco on November 8, 1978 provided that the deeds of trust on the partners' resi-dences would be released upon payment of the underlying obligations they secured. Those loans were paid in full on January 16, 1979. Despite the repeated oral demands, the deed of trust on Mr. Henry's residence was not released until June 7, 1979, al-though the remaining two had been re-leased on January 25, 1979. The superior court concluded that Statebank breached a legal duty to Henry in failing to release the deed on his house promptly.

Statebank argues on appeal that its con-duct was justified under AS 34.20.050, which requires that a mortgagee make a written request to the mortgagor before the mortgagor may be penalized for failing to discharge the mortgage after the underly-ing obligation has been paid in full. Since Henry failed to make a written request, Statebank argues it did not have a legal obligation to release the deed.

■ Fairco does not controvert State-bank's claim that AS 34.20.050 governs deeds of trust, but argues that Statebank's duty to release the property was founded upon the parties' contract rather than a statutory provision. The November 8 agreement did not state that a written re-quest was a prerequisite to the release of the partners' deeds of trust. All precondi-tions to release contained therein were ful-filled on January 16, 1979. We agree with Fairco that Statebank's duty to request re-lease of the deed of trust matured on that date. Its failure to fulfill this obligation constituted a breach of the agreement em-bodied in the November 8 contract. Thus, we hold that the superior court was correct in its ruling that Statebank unjustifiably delayed in releasing the deed of trust on Henry's property.

## V. DAMAGES

The three acts which gave rise to the damages awarded in this case were State-bank's "repossession" of the collateral con-tained in Clowntown (the closure lasted from 8 p.m. to 11 p.m. on November 6, 1978), its refusal to honor checks drawn by Fairco presented to it for payment on No-vember 7, 1978 (Statebank marked them "Account Closed"), and its failure to notify Fairco that it would charge its account for title insurance taken out on the partners' residences. The superior court decided that these acts gave rise to causes of actions sounding in tort—conversion and defama-tion. Two of the Fairco partners were

---

**8.** In support of this ruling the Supreme Court of Nevada cited the following authorities: *Ford Motor Credit Company v. Waters*, 273 So.2d 96 (Fla.App.1973); *Fontaine v. Industrial National Bank of Rhode Island*, 111 R.I. 6, 298 A.2d 521 (1973); *Varela v. Wells Fargo Banks*, 15 Cal. App.3d 741, 93 Cal.Rptr. 428 (1971).

**9.** Our holding has made it unnecessary to ad-dress appellant's argument pertaining to any of the other bases of liability upon which the superior court grounded its decision.

awarded compensatory damages for harm done to their business reputations by the closure of Clowntown and dishonor of Fairco checks. Fairco was awarded compensatory damages for time spent remedying the problem arising from the foreclosure, for wrongful dishonor and for sums withdrawn from its account for title insurance. Fairco was also awarded $35,000 in punitive damages.

A. *Award for time spent remedying problems arising from foreclosure and dishonor*

■ Fairco was awarded $4,800 as compensation for time spent remedying problems arising from the repossession and dishonor. Our review of the record has persuaded us that the evidence in support of this award is insufficient. Therefore, this portion of the superior court's damage award must be reversed and set aside.[10]

B. *Damages for defamation*

■ The superior court concluded that the repossession of Clowntown and seizure of its deposit account damaged the business reputations of Henry and Warwick.[11] The superior court awarded Warwick $10,000

and Henry $3,000 in compensatory damages for harm done to their business reputations. Review of the record indicates that Warwick was alleging harm arising primarily out of the repossession, while Henry based his claim on both the repossession and the wrongful dishonor.[12] We have concluded that the compensatory damage awards made to Henry and Warwick for injury to their business reputations should be sustained since we are of the opinion that Statebank's repossession of the collateral—closure of Clowntown—constituted conduct which was defamatory per se and that the size of the defamation award was not manifestly unjust.

■ Statebank's conduct was clearly defamatory despite the fact that the statement communicated by the repossession was not actually verbalized. In *M & S Furniture Sales Co., Inc. v. Edward J. De Bartolo Corp.*, 249 Md. 540, 241 A.2d 126 (Md.App.1968), a commercial tenant in a shopping center sued his landlord for defamation after the landlord locked him out of the store. The tenant alleged that customers and business associates would interpret the lockout as a statement that the tenant had failed to honor his commercial obliga-

10. Alternatively, we note that these damages were in the nature of special damages which were not alluded to in the complaint. Statebank argues that Fairco's failure to comply with Civil Rule 9(h) precludes such an award.

In *Anchorage Asphalt Paving Co. v. Lewis*, 629 P.2d 65, 70 (Alaska 1981), we observed that special damages must be pleaded to put the other party on notice of specific sums claimed and that failure to raise the issue in the pleadings or at trial precluded consideration of it on appeal. Special damages "must be specifically claimed and described if recovery for them is to be allowed." C. McCormick, Law of Damages § 8 at 33 (1935). Fairco presented some testimony from Warwick regarding the amount of time devoted to "straightening [the] matter out":

> A substantial amount, and when we sit down and try to explain why its hard to. But I would imagine we have—oh, in this period of time between the—between the closure and refinancing, probably several man weeks. Forty, eighty, a hundred and twenty hours, maybe.

This testimony cannot be regarded as sufficient to have put Statebank on notice that the issue

was being presented or to support the actual award.

11. In regard to this defamation issue the superior court made the following findings:

> By taking possession of Clowntown Alaska Statebank made and publicized a statement that plaintiffs had unjustifiably failed to pay their debts to Alaska Statebank. Such statement was false and was communicated to the people present at the repossession, other Bentley Mall merchants, the Fairbanks business community and to the suppliers of both Clowntown and Fairbanks Office Supply. This action constitutes defamation.
>   ... By wrongfully dishonoring checks drawn on Fairco's account and marking checks "account closed," Alaska Statebank made and publicized statements that Fairco had issued bad checks. This action constitutes defamation.

12. Warwick offered no proof of injuries sustained as a result of the wrongful dishonor, so dishonor cannot furnish a basis for his $10,000 damage award.

tions. In fact, all rent had been paid and there was no justification for the defendant's conduct. The court held that this action, unaccompanied by words, could sustain a suit for defamation. 241 A.2d 126 at 128. *See also Schultz v. Frankfort Marine Accident & Plate Glass Ins. Co.,* 151 Wis. 537, 139 N.W. 386, 390 (1913) (actual pursuit and public surveillance of a person and his home are actionable as being defamatory).[13]

Similarly, in the case before us, Statebank's act of closing Clowntown was suggestive of Fairco's failure to honor financial obligations, constituting a "statement" that spread throughout the business community and impaired Henry's and Warwick's relationships with customers, clients, employees, business associates and suppliers.[14]

■ We now turn to an assessment of the propriety of the damage award. As a threshold matter, it is necessary to determine whether the offensive statement was defamatory per se or per quod.[15] The general rule is that a plaintiff need not allege or prove (special) damages resulting from publication of a statement that is libelous per se [16] whereas evidence of specific harm suffered must be adduced if the statement is not defamatory on its face. It has been held that statements injurious to plaintiff's business reputation are defamatory per se, *Cook v. Safeway Stores, Inc.,* 266 Or. 77, 511 P.2d 375, 378 (1973) (en banc), and, in particular, that where "the words spoken by the defendant were such as to either impute a crime to the plaintiff or to affect his credit and financial reputation by imputing financial difficulty or dishonesty" recovery is permitted without proof of special damages. *Cinquanta v. Burdett,* 154 Colo. 37, 388 P.2d 779, 780 (1963) (en banc). Proof of actual damages was therefore not necessary to support the awards to Henry and Warwick for harm done to their business reputation by closure of the store.

■ Appellate courts permit the trier of fact a great deal of latitude in determining the magnitude of such damage awards. Since proof of damages is not required if words are deemed actionable per se, they clearly cannot be computed with mathematical certainty. *Eslinger v. Henderson,* 80 N.M. 479, 457 P.2d 998, 1000 (1969). In *Bertero v. National General Corp.,* 13 Cal.3d 43, 118 Cal.Rptr. 184, 529 P.2d 608 (1974), the court observed that:

The fixing of . . . damages [for harm suffered to intangible interests such as

**13.** The *Schultz* court reasoned that:
> [T]he acts here complained of are the analogue of libel, except the writing, printing, and passing around. But these elements are supplied by the public, notorious, and continued character of the surveillance. We must hold that rough or open shadowing as here described and defined is an unlawful act resulting in legal injury to the reputation of the person who is the object of such attentions. Actual pursuit and public surveillance of person and home are suggestive of criminality fatal to public esteem and productive of public contempt or ridicule.

139 N.W. at 390.

**14.** The testimony of two customers present at the closure reveals that the lockup itself (if not the reason for it) was public. The partners supplied testimony regarding the extent of the damages suffered. Henry indicated that he had problems with customers and employees after news of the closure spread around town. Warwick stated that potential clients in tax matters in early 1979 were deterred from consulting him because of the closure.

**15.** We described (although not in so many words) the distinction between statements which are defamatory per se and per quod in *Fairbanks Publishing Co. v. Pitka,* 376 P.2d 190 (Alaska 1962):
> For a publication to be libelous per se the words used must be so unambiguous as to be reasonably susceptible of only one interpretation—that is, one which has a natural tendency to injure another's reputation . . . . But if the language used is capable of two interpretations, one of which would be defamatory and the other not, then it is for the jury to determine which meaning would be given the words by those who read them.

*Id.* at 194 (footnotes omitted). If the latter alternative is applicable, the statement is defamatory per quod.

**16.** *See, e.g. Inter-State Detective Bureau, Inc. v. Denver Post, Inc.,* 29 Colo.App. 313, 484 P.2d 131, 133 (1971); *Getchell v. Auto Bar Systems Northwest, Inc.,* 73 Wash.2d 831, 440 P.2d 843, 848 (1968) (if defamation is actionable per se, and pertinent defense is not established, substantial damages may be awarded without proof of actual damages).

reputation] has long been vested in the sound discretion of the trier of fact ... subject only to the passion and prejudice standard.

*Id.* at 624 (citations omitted). Similarly, in *American National Watermattress Corp. v. Manville,* 642 P.2d 1330, 1340 (Alaska 1982), we reiterated with approval the standard to be used in deciding whether a damage award is excessive which was enunciated in *Beaulieu v. Elliott,* 434 P.2d 665 (Alaska 1967). In *Beaulieu,* a judge-tried case, the court stated:

We shall not set aside an award on a claim of excessiveness unless it is so large as to strike us that it is *manifestly unjust,* such as being the *result of passion or prejudice* or a disregard of the evidence or rules of law.

642 P.2d at 1340, *quoting* 434 P.2d at 676 (footnote omitted) (emphasis added by *American National* court). In light of the above we conclude neither award is excessive.[17]

### C. *Punitive Damages*

The superior court awarded Fairco $35,000 in punitive damages. Implicit in the superior court decision is its conclusion that Statebank's wrongful repossession and dishonor constituted the principal bases for its award of punitive damages. Thus, the issue on appeal is whether punitive damages may be awarded for the wrongful repossession and dishonor of checks.[18]

Statebank's position that the punitive damage award must be reversed since the wrongful conduct constituted breach of contract is simply incorrect. Punitive damage awards have been sustained in several wrongful repossession cases. The propriety of these judgments has been gauged according to principles generally invoked when exemplary damage judgments are challenged. In *Sturm, Ruger & Co., Inc. v. Day,* 594 P.2d 38 (Alaska 1979), *on rehearing,* 615 P.2d 621 (Alaska 1980), *on rehearing,* 627 P.2d 204 (Alaska 1981), *cert. denied,* 454 U.S. 894, 102 S.Ct. 391, 70 L.Ed.2d 209 (1981), it was observed that in order to recover punitive damages, the plaintiff must prove that the wrongdoer's conduct was outrageous, such as acts done with malice or bad motives or a reckless indifference to the interests of another. Actual malice need not be proved. 594 P.2d at 46. *Accord, Bridges v. Alaska Housing Authority,* 375 P.2d 696, 702 (Alaska 1962). Courts considering the propriety of exemplary damage awards in cases such as the instant one, have refused to countenance arguments that they were inappropriate in these situations:

We conclude that there was sufficient evidence from which the jury could have concluded that defendant's conduct amounted to deliberate disregard of or reckless indifference to plaintiff's rights in the trailer. The trial court did not err in submitting the issue of punitive damages to the jury.

*Compton v. Creager Trucking Co., Inc.,* 282 Or. 521, 579 P.2d 1297, 1301 (1978) (footnote omitted). *See also Ford Motor Credit Co. v. Milline,* 137 Ga.App. 585, 224 S.E.2d 437, 440 (1976) (punitive damages will be allowed

---

**17.** In regard to the $3,000 award to Henry for the bank's wrongful dishonor of checks drawn on Fairco's account, the superior court did not distinguish between sums awarded for damages caused by wrongful dishonor and those caused by the repossession and closure of the store. Since we have held that proof of actual damages was not necessary in relation to the harm done to Henry's business reputation by the wrongful repossession, we in turn find it unnecessary here to address any issues relating to the bank's acts of wrongful dishonor.

**18.** *See, e.g., Lawrence v. Graham,* 29 Md.App. 422, 349 A.2d 271 (1975), a case involving wrongful repossession of collateral, where the court observed that punitive damages were available in such cases, although on a more limited basis than in other tort actions:

As a general rule, punitive damages may be awarded where there is an element of fraud, or malice, or evil intent, or oppression entering into and forming part of the wrongful act....

A more stringent rule applies, however, where the tort arises out of a contractual relationship. In such a case, punitive damages are recoverable only upon a showing of actual malice.

*Id.* at 274–75 (citations omitted).

upon a showing of wantonness or oppression).

In some instances, courts have conditioned an award of punitive damages for wrongful repossession upon a showing of actual malice. *See Henderson v. Maryland National Bank,* 278 Md. 514, 366 A.2d 1, 4 (1976); *Lawrence v. Graham,* 29 Md.App. 422, 349 A.2d 271, 275 (1975); *Sopkin v. Premier Pontiac Inc.,* 539 P.2d 1393, 1397 (Okl.App.1975). A finding that the creditor was acting under a mistaken belief that it had the legal right to repossess the collateral has led these courts to conclude that punitive damage awards were unjustified. The *Lawrence* court found that the defendant had acted under an honest but mistaken assertion of a right and disallowed punitive damages. Even when courts have not explicitly required a showing of actual malice, they have not permitted punitive damages to be awarded in cases of honest mistake. *See, e.g., Ford Motor Credit Co. v. Milline,* 137 Ga.App. 585, 224 S.E.2d 437, 440 (1976); *Compton v. Creager Trucking Co., Inc.,* 282 Or. 521, 579 P.2d 1297, 1301 (1978) (no punitive damages permitted if it is clear that defendants' acts were prompted by a misunderstanding by them of their legal rights).[19]

■ Our review of the entire record has led us to the conclusion that the superior court's award of punitive damages arising from Statebank's wrongful repossession should be sustained. The superior court found "as a reasonable inference" that Statebank intended to take possession of the Fairco premises "in order to accomplish its objective of obtaining additional collateral not only on the $50,000 loan, but also on the $120,000 loan." The superior court further concluded in part that:

(29) Given all the facts and the circumstances, the bank's conduct in the handling of the negotiations and in taking possession, its motive, and purpose, this Court finds that the Bank was not acting "honestly in fact" and was specifically acting for the purpose of setting an example and putting plaintiffs under duress to coerce them to agree to terms to which the plaintiffs were not obligated to agree. As such, the Bank's conduct was willful, wanton, outrageous, reckless, and without regard to the interests of the *plaintiffs.*[20]

---

**19.** Punitive damages have often not been allowed in cases when the wrongfulness of the repossession arose from the fact that the creditor was estopped from asserting its rights under a written security agreement. Thus, in *Ford Motor Credit Co. v. Washington,* 573 S.W.2d 616 (Tex.Civ.App.1978), the court followed the "rule that a party, having once waived by its conduct strict compliance with the terms of a contract, can assert its right to strict compliance in the future [only] by notifying the other party of its intent to do so and by allowing a reasonable time for the other party to comply" in upholding damages awarded for a conversion. *Id.* at 618. However, it found that the waiver had taken place by conduct and was not a voluntary relinquishment of a known right, and thus reversed an award of punitive damages on the ground that there had been no showing of wantonness or malice. *Id.* at 618–19. Similarly, in *Cobb v. Midwest Recovery Bureau Co.,* 295 N.W.2d 232 (Minn.1980), the court observed that in light of the split in authority regarding the necessity for prior notice when there has been a waiver by conduct of specific provisions of a security agreement, punitive damages should not be awarded against the defendant creditor who could not be said to have intentionally violated the debtor's rights. *Id.* at 237–38.

**20.** In this regard the superior court also found that:

(30) Alaska Statebank did not take possession of the collateral on November 6, 1978 for the purpose of preventing the plaintiffs from selling, stealing or removing the inventory. Such purpose, although expressed by Mr. Lewis, was not a true concern of the Bank at the time of the taking of possession.

(31) The facts and circumstances surrounding the actual taking of possession of Clowntown on November 6, 1978, the manner of the taking of possession and the timing of it demonstrate an improper motive, could be expected to and did cause unnecessary damage and embarrassment, and therefore the Court concludes that Alaska Statebank breached its obligation of good faith and the obligation of fair dealing by taking possession of Clowntown.

Also relevant to the punitive damages issue are the following findings of the superior court:

(21) Up and through November 6, 1978, the date of the taking of possession, Lewis knew very little about the principals in Fairco. He did not request input from Mr. Rienekka or Mr. Fosheim, Alaska Statebank's representatives in Fairbanks who were familiar with the principals, their reputations and

The record shows that Statebank violated standard banking practices in taking collateral for purposes other than insuring its availability to satisfy debts. Statebank acted to make an example of Fairco, and to subject Fairco to duress in order to coerce Fairco into agreeing to terms which a creditor had no right to force upon its debtors. The foregoing demonstrates that the superior court had an adequate evidentiary basis for holding that Fairco was entitled to punitive damages.

The second basis for the superior court's award of punitive damages is that of wrongful dishonor. As a rule, tort actions (and concomitant damage remedies) may be pursued in cases of wrongful dishonor. "[T]he general rule that the relationship between a bank and depositor is contractual ... does not apply to the special situation of wrongful dishonor." *Shaw v. Union Bank and Trust Co.,* 640 P.2d 953, 956 (Okl. 1981). However, the Alaska UCC limits damages to those "actually proved" if the dishonor is wrongful but mistaken.[21] Case law indicates that a "mistaken" dishonor is one which results from bookkeeping errors and similar inadvertent conduct. *See Elizarraras v. Bank of El Paso,* 631 F.2d 366, 376–77 (5th Cir.1980); *Yacht Club Sales and Service, Inc. v. First National Bank of*

*North Idaho,* 101 Idaho 852, 623 P.2d 464 (1980):

> On the other hand, where a dishonor is caused by a setoff or charge made by a bank under an erroneous belief that it had a legal right to do so, the wrongful dishonor resulting from the improper setoff or charge is not classified as mistaken.

*Id.* at 471–72. In the absence of mistake, there is no statutory ceiling on damage awards.[22]

AS 45.04.402 would not permit an award of punitive damages if the wrongful dishonor occurred through a mistake.[23] However, the statute indicates that a payor bank is liable for "proximate" damages if the dishonor was not inadvertent. The permissible scope of "proximate" damages has not been delineated in Alaska. However, this provision is identical to the parallel UCC section, 4–402, which has been construed in other states to permit liability for punitive damages, providing the bank's conduct "may be said to [have been] maliciously intentional, fraudulent, oppressive, or committed recklessly or with a wanton disregard of the depositor's rights." 3 Anderson, Uniform Commercial Code § 4–402:4, at 306 (2d ed. 1971) (footnote omitted). Anderson cites *Loucks v. Albuquerque National Bank,* 76 N.M. 735, 418 P.2d 191 (1966), where the court indicated that punitive

---

financial condition, and made no effort to learn anything about the principals. By failing to acquaint himself with the financial condition of the borrowers as individuals, prior to taking possession, Lewis violated standard banking practice.

(22) ... The Court does not accept the Bank's contention that the plaintiffs were being uncooperative. The Court specifically finds to the contrary. The plaintiffs were making an honest effort to negotiate and arrive at terms of payment of their obligations, to the mutual benefit and satisfaction of all parties.

(25) Alaska Statebank did not initiate or conclude the taking of possession for the purpose of insuring that the collateral would be available for the satisfaction of the notes.

**21.** *See* AS 45.04.402:

A payor bank is liable to its customer for damages proximately caused by the wrongful dishonor of an item. If the dishonor occurs through mistake, liability is limited to actual

damages proved. If so proximately caused and proved, damages may include damages for an arrest or prosecution of the customer or other consequential damages. Whether consequential damages are proximately caused by the wrongful dishonor is a question of fact to be determined in each case.

**22.** Some courts have held that a plaintiff must prove actual damages proximately caused by the dishonor even if the bank's conduct was intentional, *Yacht Club,* 623 P.2d at 474, while others have held that in the absence of mistake the common-law "trader rule" applies. *Elizarraras,* 631 F.2d at 376.

> Because of the difficulty of proving that an injury was "proximately caused" by a wrongful dishonor, the law formerly allowed damages without proof under the "trader's rule". The customer, especially a commercial depositor, was *presumed* to be injured.

*Shaw,* 640 P.2d at 956 n. 3 (citation omitted) (emphasis by the court).

**23.** For text of AS 45.04.402 see *supra* note 21.

damages would have been appropriate had the dishonor in that case been malicious, meaning "that the defendant not only intended to do the act which is ascertained to be wrongful, but that he knew it was wrong when he did it." 418 P.2d at 199 (citation omitted). The *Loucks* court concluded that the trial court had properly dismissed the claim for punitive damages, since the plaintiff had adduced no evidence of willful or wanton conduct. *Id.* In *Shaw v. Union Bank and Trust Co.,* 640 P.2d 953 (Okl.1981), the court did remand a case for a trial on the issue of punitive damages, observing that:

> [The] general rule [that the relationship between a bank and depositor is not contractual] . . . does not apply to the special situation of wrongful dishonor.
>
> . . . .
>
> Appellant here alleges in his petition that appellee bank "acted in a wrongful, malicious, and grossly negligent manner in refusing to release the funds." Appellant should be given the opportunity to prove these allegations.

*Id.* at 956, 957. Similarly, the Idaho Supreme Court held in *Yacht Club Sales and Service, Inc. v. First National Bank of North Idaho,* 101 Idaho 852, 623 P.2d 464, 476 (1980), that a customer would be entitled to punitive damages upon a showing that the defendant bank's conduct was wanton, malicious or gross and outrageous, or where the facts are such as to imply malice or oppression. 623 P.2d at 476.

Given the foregoing, our review of the entire record leads us to the conclusion that Statebank's wrongful dishonor furnishes additional justification for the superior court's award of punitive damages. In regard to the question of wrongful dishonor the superior court found in part that:

> (15) Following the taking of possession of Clowntown on November 6, 1978 Alaska Statebank willfully and with reckless disregard of the consequences of its actions refused payment on outstanding Fairco checks presented for payment, returned the checks to Clowntown's suppliers and vendors, and marked the checks

"account closed." At this time the account was not closed, Alaska Statebank was aware the account was not closed, and these actions were not the result of mistake or inadvertence, but rather were designed to further the Bank's interest. Alaska Statebank had no legitimate reason to refuse payment.

There is ample evidentiary support for the above. Thus, we conclude that the superior court's award of punitive damages should be affirmed.

The superior court's judgment is AFFIRMED in part, and REVERSED in part, in accordance with this opinion.

MOORE, J., not participating.