ALLONAS et al., d.b.a. Mike's TV and Appliances, Appellants,

v.

ROYER et al.; Borg–Warner Acceptance Corporation et al., Appellees.

[Cite as *Allonas v. Royer* (1990), 67 Ohio App.3d 293.]

Court of Appeals of Ohio,
Crawford County.

No. 3–88–29.

Decided April 11, 1990.

*Paul Wallace* and *James McCorkle,* for appellants.

*Arter & Hadden, David R. Watkins* and *James P. Connors,* for appellees Whirlpool Acceptance Corporation and Thomas Byers.

*Edward Kirk,* for appellee Borg–Warner Acceptance Corporation.

GUERNSEY, Judge.

This is an appeal by the plaintiffs, James Michael Allonas and Lynn Allonas, husband and wife and partners d.b.a. Mike's TV and Appliances, from a summary judgment of the Court of Common Pleas of Crawford County in favor of the defendants, Borg–Warner Acceptance Corporation and Whirlpool Acceptance Corporation, in a civil action brought by the partnership against

the two corporations and several individuals seeking to recover compensatory and punitive damages on four counts for the wrongful and malicious seizure of plaintiffs' property, for its conversion, for lost profits from the loss of sales, and for the loss of their business in its entirety. Another count against an individual was joined in the original action, but that individual as well as another individual were dismissed prior to the entry of summary judgment. Notwithstanding that the summary judgment is in favor of the two corporations and their respective agents, and the notice of appeal does not identify the respective appellees, plaintiffs state in their appellate brief that "only Appellees Borg–Warner and Whirlpool Acceptance Corporation remain."

In June 1986, the plaintiffs formed their partnership and commenced business selling and servicing televisions and appliances. At that time they needed credit to provide a sales inventory, and previously on May 12, 1986, had signed a floor plan agreement with Borg–Warner Acceptance Corporation, hereinafter known as Borg–Warner, and subsequently on September 6, 1986, they signed another floor plan agreement with Whirlpool Acceptance Corporation, hereinafter Whirlpool. Each of these agreements had the effect of providing to plaintiffs a line of credit. Whenever they ordered merchandise their respective wholesale suppliers, or distributors, would furnish to the acceptance corporation serving them a list of the items ordered and its cost to the partnership. In the event that the financing corporation approved of the purchase it would advise the supplier and the partnership and pay the supplier, whereupon the merchandise would be shipped to the partnership subject to a security interest in the financing corporation. The floor plan agreements further provided that the financing corporations would also have a security interest in all other inventory which the partnership owned together with money received in payment therefor, accounts receivable, etc. Each agreement provided that the partnership was to make payments to the financing corporations as each item of inventory was sold, the payments to include the stated cost of the item of inventory, together with finance charges. Alternatively, under the Whirlpool agreement, when payment was not made on the exact day of sale, it was required to be made weekly. Additionally, both Borg–Warner and Whirlpool had the privilege to and did send their agents to the premises of the partnership business at least once, and sometimes twice a month, to inspect the merchandise on the floor and compare its inventory with their records showing which items of merchandise had not been paid for by payments made by the partnership to the financing corporation. To the extent that items were missing from the floor inventory and had not been paid for, it was the partnership's obligation unless explained to the satisfaction of the financing corporation, to cure any previous default in

payment for items missing from the floor, by making payment on the day of the inspection before the corporate agents left the premises.

In January 1987, plaintiff Michael Allonas did not consistently report to work during the first part of the month, his explanation in his deposition being that he remained home suffering from an abscessed tooth. He and his wife had designated employee Marty Royer in December 1986 to be the store manager and empowered him to make management decisions during the month of January. In approximately the middle of the month plaintiffs visited Royer's home, told him that they were going on vacation and would let him know where and when they reached their destination, and that they expected to be back prior to January 27.

The business operated with two bank accounts. One was a checking account in the business name over which each of the partners had signature power, but Royer did not. The other was a savings account in the sole name of Lynn Allonas and over which she had the only power of withdrawal. Prior to their departure on vacation, she withdrew about $6,000 from the savings account which she took with her on vacation, leaving about $5,500 remaining on deposit in the savings account. Her husband left a number of signed blank checks drawn on the checking account with the partnership bookkeeper and Royer was instructed to use these checks to pay any business expenses, including employees' salaries, during their absence.

On January 23, an agent of Borg–Warner arrived to make an inventory inspection, which he proceeded to do, at which time he was unable to obtain an $8,842.06 payment for the unaccounted-for inventory although payment was demanded.

On January 27, an agent of Whirlpool arrived to make an inventory inspection, which he proceeded to do, at which time he also was unable to obtain a check for $3,428 for the unaccounted-for inventory and reported such fact to his superiors. His superior contacted Royer and was told by Royer that the partners were on vacation, had not advised him where they had gone, and had not returned when they said they would. On January 29, agents of both Whirlpool and Borg–Warner appeared on the scene. Each made another inventory inspection to see what amount was due each of the principals. Meanwhile Royer had been informed that his employers had gone to Colorado, and that Mike Allonas would call at about 11:00 a.m. on January 29. Sometime prior to his call the agents learned in talking to Royer and the bookkeeper that there was only enough money in the business checking account to pay about $2,200 of the approximately $12,270 due from the partnership to the two corporations, that although there was $5,500 in the savings account, it could not be withdrawn without Mrs. Allonas making the withdrawal and, in any

event, would not make up enough money to satisfy the amounts due to both acceptance corporations. The agents also learned that the money was accumulated in the savings account to be applied to sales tax due from the partnership for the state of Ohio, that at the time there was more than $20,000 of such sales tax due on previous sales, and that the partnership was also indebted to other creditors.

At or about 11:00 a.m. Mike Allonas called and talked to the agents of the two corporations who advised him that they had to have their money or they would repossess the inventory. Mrs. Allonas also talked on the phone and said that she had $4,000 to $5,000 with her which could be paid on the debt. There was also testimony that Mrs. Allonas said she had some friend(s) who had indicated an interest in investing in the business. Michael Allonas testified in his deposition that Ed Courtade, agent for Borg–Warner, "[m]entioned the fact that there was some money that was owed, * * * but he didn't mention an amount * * * and he mentioned the fact that there was no problem because my word was always good with his [sic], nothing that couldn't wait until we got back." Mrs. Allonas testified:

"After Michael had talked to him, he handed me the phone. Tom [Whirlpool's agent] asked me how we were going to pay, he didn't have a figure at that time, but he asked me how I planned on paying whenever, you know, and I had told him how much I had in my checking and in my savings and all of my accounts, and I told him how much I had on me, and I asked him if I could fly back and pay them. He said that's not necessary."

In his affidavit, filed in opposition to the motion for summary judgment, Michael Allonas states, among other things:

"2. On or about January 27, 1987, the day Mike's TV & Appliances' inventory was repossessed by Defendants, I spoke on the telephone with Defendant Edward Courtade, III.

"3. During the course of the above telephone conversation, Defendant Courtade informed me that payment could be made upon my return to Galion and that 'your word is good with me and we'll wait until you return';

"4. During the course of the same phone call, I heard my wife, Lynn Allonas, offer to fly back to Ohio and to return to Galion that day to transfer funds and to make full payment to Defendants of the amounts owed to Defendants * * *."

In her affidavit filed in opposition to the motion for summary judgment Mrs. Allonas, states, among other things:

"2. On or about January 27, 1987 the day Mike's TV & Appliances' inventory was repossessed by Defendants, I spoke on the telephone with Defendant Edward Courtade, III.

"3. On January 27, 1988, during the course of my phone conversation with Defendant Thomas Byers, I offered to fly back to Ohio and return to Galion that day to pay the balance due Defendants with the cash in my possession and with funds from various checking and savings accounts. Defendant Byers told me that such action would not be necessary."

Notwithstanding these assertions of the plaintiffs, the agents of the defendant corporations then waited four hours, more or less, on January 29, 1987, to find out whether Mike Allonas's father would pay the money needed to satisfy the partnership's accounts with the corporation. When finally told that he would not do so, they proceeded to repossess all of the items of inventory in the store with the exception of some of the smaller items which had not been financed by the defendant corporations when purchased. These repossessions included a number of items of inventory on the floor which plaintiffs had paid for.

Thereafter, to the extent that items of inventory could not be returned to the suppliers by virtue of agreements of the suppliers with the corporations, the remaining items of inventory were sold to satisfy their claims, and the balance of sale proceeds was returned to the plaintiffs.

### "First Assignment of Error

"The trial court erred in granting the motion for summary judgment because it failed to follow the guidelines of Rule 56(C) in that the court failed to construe the evidence submitted most strongly in favor of the party against whom the motion is made, and in this case, didn't consider any of the appellants' evidence whatsoever.

### "Second Assignment of Error

"The trial court failed to consider and to apply the doctrine of promissory estoppel to the facts of this case which resulted in an erroneous granting of the motion for summary judgment."

As the contentions of plaintiffs under the second assignment of error are largely included within the scope of the first assignment of error we will consider these assignments of error together.

In addition to their contentions in their depositions and affidavits as to the telephone conversations between the plaintiffs and the representatives of the defendant corporations, they further claim that the trial court ignored the following paragraph which appears in each of their affidavits:

"On or about January 27, 1987, there was [*sic*] sufficient funds in my possession and/or in bank accounts of the business to pay the amounts due Defendants WAC and BWAC."

We will ignore the technical ambiguity arising from the fact that the date of January 27 is here referred to whereas the final failure to pay and the repossessions occurred on January 29. All of the evidence in the depositions filed in support of the motion for summary judgment was to the contrary. On January 29, there was only enough in the business checking account on which to draw a $2,200 check to Borg–Warner, only $5,500 in the business savings account in the wife's name, and only between $4,000 and $5,000 in the possession of Mrs. Allonas. Thus, a total of only $11,700 to $12,700 existed to pay off at least $12,270 to the two finance corporations and more than $20,000 to the state of Ohio, a total of more than $32,270. The plaintiffs have not furnished any other evidence as to what funds they had available other than those figures brought out in the depositions. In the face of these facts as to funds their statement that they had "sufficient funds" is a mere conclusion without support. This approaches weighing of the evidence, and tends to show the existence of an issue as to a material fact, either of which would, in an appropriate case, be cause for denying a summary judgment. However, for summary judgment to be denied, the issue of a material fact must be *genuine* and it would seem that even without weighing the evidence *"reasonable minds* can come to but one conclusion and that conclusion is adverse to the party entitled to have the evidence or stipulation construed most strongly in his favor." (Emphasis added.)

The plaintiffs then contend that the telephone conversations resulted in an estoppel by reason of a promise by the defendant corporations through their agents to forbear repossession action until the plaintiffs returned from vacation. The agents of the defendant corporations deny that in their telephone conversations with plaintiffs they made such statements as claimed by the plaintiff in their depositions and their affidavits. There are at least two problems with plaintiffs' claims in this regard. First, if any deferral of action was promised, there was no reliance on same, for plaintiffs immediately returned from Colorado, and then did not produce funds to pay off the obligations. Second, if there was a promise or representation of deferral of action it, as well as plaintiffs' claims as to "sufficiency" of funds, was overcome by the specific provisions of the floor plan agreements providing for immediate repossession in the event of failure to make the required payments or in the event of other specified breach of the agreements. Thus, in the Borg–Warner agreement the debtor agreed to pay all taxes which may be levied or assessed against the collateral, that any breach of the agreement

constituted default, that default occurred on any failure by debtor to satisfy any indebtedness whatsoever to Borg–Warner, and that in the event of default Borg–Warner shall have, in addition to any and all rights under the Uniform Commercial Code, the option to terminate the agreement *immediately* and to declare any and all indebtedness of the debtor immediately due and payable without notice or demand, and "specifically the right to take immediate and exclusive possession of said Collateral and every part thereof." Plaintiffs further had agreed that "any law, custom or usage to the contrary notwithstanding, that Secured Party shall have the right at all times to enforce the covenants and provisions of this Agreement in strict accordance with the terms thereof, notwithstanding any conduct or custom on the part of the Secured Party in refraining from so doing at any time or times; and further, that the failure of the Secured Party at any time or times to enforce its right under said covenants and provisions strictly in accordance with the same shall not be construed as having created a custom in any way or manner contrary to the specific terms and provisions of this Agreement or as having in any way or manner modified, altered or waived the same."

The Whirlpool agreement contains provisions similar to those of the Borg–Warner agreement together with a provision that any "modification of this Agreement or waiver of any provisions herein contained shall not be binding upon * * * [Whirlpool] unless in writing and signed on behalf of W/A by a duly authorized officer."

Thus, as to both agreements the action of the corporations in repossessing and removing the inventory was within the specific terms thereof upon failure to make payments (or upon other breaches) and the rights of the corporations were not affected or waived by the availability of funds or by any representation that repossession action would be deferred pending the return of the plaintiffs from their vacation. See *Boudreau v. Borg–Warner Acceptance Corp.* (C.A.9, 1980), 616 F.2d 1077, and *K.B. Oil Co. v. Ford Motor Credit Co., Inc.* (C.A.6, 1987), 811 F.2d 310.

We find each of the plaintiffs' first and second assignments of error without merit.

## "Third Assignment of Error

"The trial court erred in not applying the covenant of good faith and fair dealing into the contract between appellants and appellees."

■ Under this assignment of error the plaintiffs assert the application of R.C. 1301.09 providing that "[e]very contract or duty within this Act [the Uniform Commercial Code] imposes an obligation of good faith in its performance or enforcement, asserting that, at the least, notice of an intention to

repossess and a reasonable time to cure the default was required notwithstanding the terms of the agreement," citing *Sahadi v. Continental Illinois National Bank & Trust Co.* (C.A.7, 1983), 706 F.2d 193.

However, the record does not support plaintiffs' contention that there was no notice given by defendant corporations of their intentions to repossess and that they failed to provide a reasonable time to cure the defaults after notice. The record shows that Borg–Warner conducted an inventory inspection on January 23, six days before repossession took place, at which time payment was demanded and was not made, entitling Borg–Warner to repossess, and that the plaintiffs had six days thereafter to cure the default. Similarly, Whirlpool conducted an inventory inspection on January 27, two days before repossession took place, at which time payment was demanded and not made, entitling Whirlpool to repossess, and that plaintiffs had two days thereafter to cure that default. It must be conceded that at each of these times plaintiffs were not themselves present, but their manager and agent, Mike Royer, was on the scene, acting for them, and notice to him and opportunity to him to cure default is chargeable to the plaintiffs.

The good faith requirements of R.C. 1301.09 are mutual and not merely one-sided. There appears to be no evidence of lack of good faith on the part of the defendant corporations, whereas it appears that plaintiffs did not act in good faith to meet their obligations according to the terms of their agreements with the defendant corporations. Although they left a manager in charge of their business with authority to make decisions regarding same, they effectively deprived him of the ability to act or to keep them informed, by leaving him access to only about $2,200 which could be applied *by him* to the floor plan obligations. Nor did they advise him, until probably too late for effective action, as to their whereabouts on vacation so that they could be personally advised and consulted as to the developing problems at home. Additionally, if it is to be believed, the deposition of Michael Allonas shows an abysmal ignorance on his part as to the financial aspects and condition of his business.

The assignment of error as to good faith is without merit.

#### "Fourth Assignment of Error

"Trial court erred in granting summary judgment in favor of appellees in that the contract between appellants and appellees was modified based on the course of dealing between the parties."

Under this assignment plaintiffs contend that "payment was generally made at the time of taking an inventory * * * [which] inventories were unannounced, and Appellants had no way of knowing when they were to take place," thus establishing a "course of dealing" precluding repossession under

the security agreements until some form of notice or formal demand for payment has been reasonably made, citing *Alaska Statebank v. Fairco* (Alaska 1983), 674 P.2d 288.

The record does not support that such a "course of dealing" existed in this case. Although the agreements were explicit as to payments being due upon the sale of inventory, the Whirlpool agreement additionally prescribed an alternative, *i.e.*, "To pay for items as sold, or at least weekly." It also provided that upon default by the dealer "all indebtedness of Dealer to W/A shall, at the option of W/A, without notice, become at once due and payable, and W/A shall have all of the rights and remedies of a secured party under the applicable provisions of the Uniform Commercial Code, including, but not limited to the right to enter any premises of Dealer, without legal process but without force, and to take possession and remove collateral." The Borg–Warner agreement similarly provided that "[i]n the event of default, as hereinabove defined, Secured Party shall have, in addition to any and all rights under the Uniform Commercial Code, the option to terminate this Agreement immediately and to declare any and all indebtedness or liabilities of Debtor to Secured Party * * * immediately due and payable without notice or demand, notwithstanding the provisions of any writings evidencing same; and the Secured Party shall specifically have the right to take immediate and exclusive possession of said Collateral and every part thereof, wherever it may be found * * *." Each agreement included non-waiver provisions mentioned under the second assignment of error.

The inventory inspections did not have the purpose of providing a means and time for original payment of the obligations of the partnership to the corporations but had the purpose, instead, of determining whether default had occurred in the prescribed payment at time of sale, or in Whirlpool's case, "at least weekly." It was then within the corporation's option to accept payment for same at the time of the inspection or to proceed with its remedies provided for the previous default in timely payment. Thus, payment at the time of inventory inspection was not a right of the dealer but merely a privilege extended only at the option of the corporation. Nor does the evidence show any "course of dealing" that payment was entitled to be first made at the time of the inventory inspection. In fact, there is evidence that when Allonas had been absent from his business, without explanation, at some time during November 1986, payment to one or both corporations was not made at the time of sale and the partnership was in further default thereafter at the time of inspection. Allonas was advised when he returned of the gravity of the situation with the requirements of the provision for payment at the time of sale duly emphasized.

We, therefore, find no evidence of any "course of dealing" entitling the plaintiffs to make payments other than as provided by their contracts. See also, *K.B. Oil Co. v. Ford Motor Credit Co., Inc., supra.*

The fourth assignment of error is, therefore, not well taken.

Accordingly, having found no error prejudicial to the plaintiffs in any of the particulars assigned and argued, and specifically having found no error of the trial court in its determination that no genuine issue as to any material fact existed before the trial court, or in its determination that reasonable minds could come to but one conclusion and that conclusion is adverse to be plaintiffs, the summary judgment must be affirmed.

*Judgment affirmed.*

SHAW, P.J., and THOMAS F. BRYANT, J., concur.

J. THOMAS GUERNSEY, J., retired, of the Third Appellate District, was assigned to active duty pursuant to Section 6(C), Article IV, Ohio Constitution.