825 P.2d 79

**IDAHO FIRST NATIONAL BANK, a National Banking Association, and its Successor–In–Interest, West One Bank, Idaho, N.A., Plaintiff–Respondent,**

v.

**DAVID STEED AND ASSOCIATES, INC., an Idaho Corporation and David C. Steed, Claren P. Holm, and Del Ray Holm, Defendants–Appellants.**

**DAVID STEED AND ASSOCIATES, INC., an Idaho Corporation, Del Ray Holm, Claren Holm, David Steed, Plaintiffs–Appellants,**

v.

**IDAHO FIRST NATIONAL BANK, a National Banking Association, and its Successor–in–Interest, West One Bank, Idaho, N.A., Defendant–Respondent.**

No. 18582.

Supreme Court of Idaho,
Boise, October 1991 Term.

Jan. 16, 1992.

Cosho, Humphrey, Greener & Welsh, Boise, for appellants. Richard H. Greener argued.

Holland & Hart, Boise, and Denver, Colo., for respondent. William W. Maywhort argued.

JOHNSON, Justice.

This is a lender liability case. The primary issue presented is whether the trial court was correct in granting summary judgment dismissing the counterclaim of the borrowers alleging that the lender breached the covenant of good faith and fair dealing. We agree with the trial court that there were no genuine issues of material fact concerning this counterclaim and that summary judgment was appropriate. We also rule: (1) the trial judge did not abuse his discretion in denying disqualification motions of the borrowers, (2) the borrowers were not entitled to a jury trial to determine the amount of the deficiency judgment, and (3) the deficiency and attorney fees awarded by the trial court were reasonable.

## I.

### THE BACKGROUND AND PRIOR PROCEEDINGS.

In 1982, David Steed and Associates, Inc. (DSA) purchased an equipment dealership. Idaho First National Bank (now West One Bank, Idaho) (the Bank), provided financing to DSA for this business. Claren P. Holm, Del Ray Holm, and David C. Steed (the guarantors) guaranteed the payment of the loans from the Bank to DSA. (For ease of reference the guarantors will usually not be referred to separately, but will be included in the designation DSA.)

DSA expanded its business in 1984 and applied to the Bank for additional financing. In January 1985 the Bank and DSA entered into a new loan agreement (the loan agreement). The loan agreement restructured the terms of payment for the previous loans and extended further credit. DSA provided security for the loans in the form of (1) a security interest in vehicles, equipment, and accounts receivable, (2) a deed of trust on real property, and (3) trust receipts on inventory.

One of the provisions of the loan agreement stated:

Maturity: All of [the loans provided in the loan agreement] are understood to mature and be due and payable on July 1, 1985. It is contemplated that at that time BANK will consider, but not be obligated to agree to, renewals and extensions consistent with the following terms.

Loan # 1: $450,000.00 —*If renewed at its maturity date,* this loan will again mature on July 1, 1986. A principal reduction of $90,000.00 will be required on December 15, 1985 and interest only will be due each calendar quarter during the life of the loan. This loan is to be secured by the following:

1. Continuing security agreements covering all inventories, receivables, and equipment currently owned by BORROWER or later acquired by BORROWER.

2. Deed of Trust on real property owned by BORROWER.

3. Continuing full guaranty of *all* stockholders as individuals.

Loan # 2: $150,000.00—Security agreement covering accounts receivables. Advances made under this line will be made on the basis of individual notes of not more than 90 days maturity. In no case shall the maturity of any individual note go beyond July 1, 1985. Advances will be limited in the aggregate to not more than 75% of accounts receivables aged less than 90 days as reported monthly. It is understood by the BORROWER that this line must be paid in full, with no amounts outstanding for a period of 30 consecutive days each 12 month period.

Loan # 3: $500,000.00—Such security instruments as the BANK normally requires for the "flooring" of new Ford Heavy Duty Trucks. Terms and conditions of this loan are more completely described in separate agreements and security instruments pertaining specifically to advances made under this loan.

Loan # 4: $350,000.00—Such security agreements as the BANK normally requires for the "flooring" of used farm equipment, terms and conditions of which are more completely described in separate agreements and security instruments pertaining specifically to advances under this line.

In particular, it is to be noted that in the future, flooring used equipment under this line will be limited to a single 180 day term with no renewals allowed. Items, once paid in full, may be refloored at the BANK'S discretion.

In addition to the four separate lines discussed above, the BANK will continue, through July 1, 1985, the purchase of full-recourse type contracts from BORROWER to an aggregate of $300,000.00 under the terms of the Dealer Reserve Agreement dated May 17, 1982.

By July 1, 1985, DSA had not paid all of the loans referred to in the loan agreement. In January 1986 the Bank renewed the loan agreement and extended the maturity date to February 1, 1986. The Bank stated that further extensions would depend on the

outcome of negotiations between DSA and a third party to whom DSA was attempting to sell part of its business. DSA sold part of its business to the third party and applied $751,900 of the proceeds to its loans from the Bank.

The Bank extended the maturity date for the loans three more times in 1986, with December 1, 1986, as the final extended maturity date. DSA did not pay the loans, and the Bank sued DSA to foreclose on the security given for the loans and to collect any deficiency. Shortly thereafter, the trial court granted the Bank a writ of possession allowing the Bank to seize the personal property that was security for the payment of the loans referred to in the loan agreement.

Within a few days after the Bank sued DSA, DSA sued the Bank, its directors, and some officers of the Bank. DSA's complaint contained claims for: (1) fraud and deceit by fiduciaries, (2) constructive fraud and conspiracy to breach duties owed as a result of confidential and fiduciary relationship, (3) negligence, (4) intentional infliction of emotional distress, (5) constructive trust and order for reconveyance, (6) injunctive relief, and (7) unfair competition, damages, and injunction.

The trial court consolidated the action brought by the Bank and the action brought by DSA. DSA's claims were treated as compulsory counterclaims in the Bank's foreclosure action.

Because of disputes about DSA's right to a jury trial on its counterclaims, DSA brought an original proceeding in this Court. In *David Steed and Assoc., Inc. v. Young*, 115 Idaho 247, 766 P.2d 717 (1988) (*Steed I*), the Court held that DSA was entitled to a jury trial on its legal counterclaims.

DSA then moved to amend its counterclaims to allege that the Bank had breached the covenant of good faith and fair dealing. The trial court granted this motion, but also granted the Bank's motion for summary judgment dismissing DSA's claims for fraud and deceit by fiduciaries and for constructive fraud to breach duties owed as a result of confidential and fiduci-

ary relationship. The trial court then dismissed DSA's counterclaims alleging torts committed by the Bank, but allowed DSA's contract counterclaims to continue.

Later, the trial court granted the Bank's summary judgment motion dismissing DSA's remaining counterclaims, and denied DSA's motion to file an amended counterclaim alleging: (1) fraudulent inducement, (2) breach of contract, (3) negligent misrepresentation, and (4) breach of oral contract. The trial court also denied DSA's motion for reconsideration of the summary judgment dismissing the claim for breach of the covenant of good faith and fair dealing.

During the progress of the action, the trial judge denied four motions brought by DSA to disqualify him.

Following a hearing, the trial court made findings of fact and conclusions of law and entered judgment against DSA and the guarantors for a deficiency of $610,566.21, plus costs of $13,728.21, and attorney fees of $216,178.25. DSA and the guarantors appealed.

We note preliminarily that although DSA listed as issues on appeal in its initial brief the dismissal of DSA's claim for bad faith and breach of fiduciary duty, at the time of oral argument counsel for DSA acknowledged that the dismissal of these claims was controlled by our decision in *Idaho First Nat'l Bank v. Bliss Valley Foods, Inc.*, 121 Idaho 266, 824 P.2d 841 (1991), *petition for reh'g filed* October 18, 1991.

## II.

## THE TRIAL COURT WAS CORRECT IN GRANTING SUMMARY JUDGMENT DISMISSING DSA'S COUNTERCLAIM FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING.

■ DSA asserts that the trial court should not have granted summary judgment dismissing the counterclaim alleging breach of the covenant of good faith and fair dealing. We disagree.

The Uniform Commercial Code (UCC), as adopted in Idaho, defines good faith as "honesty in fact in the conduct or transaction concerned." I.C. § 28–1–201(19). The obligation of good faith may not be disclaimed by agreement, but the parties may agree to standards by which the performance of good faith is to be measured if such standards are not manifestly unreasonable. I.C. § 28–1–102(3). The UCC governs in this case because DSA secured the Bank's loans with personal property, which is a secured transaction under I.C. §§ 28–9–101 to 28–9–507. We have held in cases where the UCC does not apply that the covenant of good faith and fair dealing cannot override an express provision in a contract negotiated and executed by the parties. *Bliss Valley*, at 288, 824 P.2d at 863. We hold that this also applies to cases governed by the UCC.

In this case, DSA argues that a genuine issue of material fact exists whether the Bank breached the covenant of good faith and fair dealing when the Bank failed to notify DSA that it intended to terminate DSA's credit line. DSA contends that the evidence shows that the Bank made the decision to terminate DSA's credit line in January 1986, but did not inform DSA of the decision until August 1986. DSA argues that reasonable notification of the decision would have enabled DSA to secure another lender. We reject this argument because of the express provisions of the maturity clause of the loan agreement.

DSA also contends that there is a genuine issue of material fact whether the maturity clause of the loan agreement was intended to refer to "term" loans that were to be automatically renewed from year to year unless the Bank notified DSA to the contrary. DSA relies in part on statements made in the Bank's letter that transmitted the loan agreement for signature by DSA in January 1985 on the affidavit of a banking expert submitted after the trial court had granted summary judgment, and on the Bank's loan manual that was attached to this affidavit.

The pertinent portions of the Bank's January 1985 letter stated:

The Idaho First National Bank has approved your request for changes in the structure of your credit lines with our bank. Attached are the appropriate agreements, etc., necessary to complete these changes which of course are more fully discussed in the agreement.

However, I wanted to perhaps highlight some of the changes. First of all, the two existing term loans (originally for $300,000 and $50,000 respectively) are to be repaid and replaced by a new term loan for $450,000. Payments on this loan are to be $90,000 principal each December plus interest paid each calendar quarter. Proceeds of this new loan will also repay the outstanding balance of your existing revolving operating line. (Approximately $148,000).

. . . .

You will no doubt note that all notes mature on July 1, 1985. This is in keeping with the annual nature of the relationship and coincides with the existing approved maturity of your line. By that time we will have received your audited statements and can assess your progress before granting such renewals as the lines might require.

Instead of creating a genuine issue of material fact, as contended by DSA, the letter confirms the meaning of the maturity clause of the loan agreement, which stated that the "loans are understood to mature and be due and payable on July 1, 1985." By the terms of the maturity clause, the Bank was not obligated to agree to renewals and extensions of the loans.

DSA argues that reference in the letter to principal payments on the $450,000 loan of $90,000 "each December plus interest paid each calendar quarter" is evidence of the intent of the parties that the loans would continue for longer than one year. The loan agreement states: "A principal reduction of $90,000.00 will be required on December 15, 1985 and interest only will be due each calendar quarter during the life of the loan."

The loan agreement is unambiguous on this point. It clearly refers only to a principal payment of $90,000 in December 1985.

The Bank retained the right not to agree to a renewal or extension of the loans after July 1, 1985. If the Bank had not granted an extension beyond July 1, 1985, the principal payment on December 15, 1985, would have become moot. To the extent the statement concerning principal payments in the Bank's letter of January 1985 conflicts with the loan agreement, the trial court properly refused to consider the letter under the parol evidence rule. *First Sec. Bank of Idaho v. Webster*, 119 Idaho 262, 265–66, 805 P.2d 468, 471–72 (1991).

■ The banking expert's affidavit and the loan manual, which DSA also contends created genuine issues of material fact, were submitted by DSA in support of a motion for reconsideration of the trial court's order granting summary judgment. The Bank moved to strike the banking expert's affidavit.

DSA moved for reconsideration of the order granting summary judgment pursuant to I.R.C.P. 11(a)(2)(B) and 59(e). The trial court considered DSA's motion for reconsideration as a motion pursuant to I.R.C.P. 60(b) to relieve DSA of the order granting summary judgment, and stated that DSA had made no attempt to establish good cause for the submission of new information in support of its motion and that DSA had not specified any grounds for relief pursuant to I.R.C.P. 60(b).

On appeal, DSA contends that our recent decision in *Coeur d'Alene Mining Co. v. First Nat'l Bank*, 118 Idaho 812, 800 P.2d 1026 (1990) supports its argument that the trial court should have considered the affidavit and the loan manual. In *Coeur d'Alene Mining*, we distinguished a trial court's authority to consider new facts in conjunction with a motion for reconsideration pursuant to I.R.C.P. 11(a)(2)(B) from the lack of authority of a trial court to consider new facts in conjunction with a motion to alter or amend a judgment pursuant to I.R.C.P. 59(e). *Id.* at 823, 800 P.2d at 1037.

*Coeur d'Alene Mining* is applicable to this case if the trial court's order, which granted summary judgment dismissing DSA's counterclaim for breach of the covenant of good faith and fair dealing, was an interlocutory order subject to reconsideration under Rule 11(a)(2)(B). The order specifically dismissed DSA's counterclaim, granted the Bank summary judgment for a deficiency, and ordered counsel for the Bank to prepare a judgment for execution by the trial court in harmony with the trial court's order.

In considering DSA's motion for reconsideration as a motion pursuant to I.R.C.P. 60(b), the trial court relied on *Marcher v. Butler*, 113 Idaho 867, 749 P.2d 486 (1988). In *Marcher*, however, the trial court ordered summary judgment against the plaintiff and also entered a judgment before the plaintiff filed a motion for reconsideration. In this case, there was no judgment, only an order dismissing DSA's counterclaim.

Until a judgment had been entered or a certificate granted by the trial court pursuant to I.R.C.P. 54(b), the order dismissing DSA's counterclaim was not final and appealable. Therefore, it was incorrect for the trial court to strike the banking expert's affidavit, which attached the Bank's loan manual.

■ For this reason, it was also not appropriate for the trial court to consider DSA's motion for reconsideration as a motion pursuant to I.R.C.P. 60(b). Rule 60(b) refers to the trial court relieving a party from "a final judgment, order, or proceeding." The order granting summary judgment was an interlocutory order, not a final order. DSA's motion should have been considered as a motion to reconsider an interlocutory order pursuant to I.R.C.P. 11(a)(2)(B). The trial court should have considered the affidavit of the banking expert and the Bank's loan manual to determine whether there was any genuine issue of material fact that would prevent the trial court from granting summary judgment.

■ DSA contends that the loan agreement set forth annual "review" dates as a mechanism of control, rather than "due" dates. DSA argues that this is consistent with custom and practice described in the banking expert's affidavit and with the

Bank's loan manual. The portions of the affidavit at issue state:

6. ... The Loan Agreement sets forth terms and conditions of the banking relationship with "review", rather than due, dates on an annual basis as the control mechanism. This arrangement is consistent with the custom and practice in the industry. This is also consistent with the Bank's Loan Manual, ... which contemplate[s] different types of maturity dates, ... [and] which defines term loans and indicates "the final maturity date is determined by any agreements to review, renew or extend."

7. Use of "review" dates is a common practice in banking. At a review date, the bank reviews the performance of the company and determines whether or not there has been substantial compliance with the terms and conditions of the loan agreement. If there has been such compliance, then the relationship is extended to the next review date where the procedure is repeated again. If there has not been compliance, based upon the circumstances, appropriate action is taken which might include restructure, extension, modification, or other responses deemed appropriate.

8. The Loan Agreement identifies the terms and conditions under which extensions of credit will be granted and continued. Those terms and conditions for DSA included: (1) a requirement that there be no monetary default; (2) a working capital requirement; (3) a net worth requirement; and (4) a debt-to-worth requirement.

In the affidavit, the banking expert then gave his opinion that the Bank's "accelerating and calling the loan" in August, 1986, was arbitrary and capricious.

We agree with the trial court, that the maturity clause of the loan agreement was unambiguous in stating that all of the loans matured and were due and payable on July 1, 1985. Therefore, parol evidence was not admissible to vary the meaning of the clause. *Webster*, 119 Idaho at 265–66, 805 P.2d at 471–72.

■ DSA also contends that the trial court should have considered evidence of the course of dealing between the Bank and DSA to determine whether there was any genuine issue of material fact concerning the meaning of the maturity clause of the loan agreement. The authorities cited by DSA in support of this proposition are *Alaska Statebank v. Fairco*, 674 P.2d 288, 292 (Alaska 1983), and I.R.E. 406.

*Fairco* apparently involved a secured transaction covered by the UCC, as enacted in Alaska. The authority cited by the Alaska Supreme Court for the application of course of dealing as a means of modifying the provisions of a secured transaction related to requiring a prerepossession notice when a lender has accepted late payments as a matter or course. 674 P.2d at 292–93.

Counsel for DSA stated at oral argument that the UCC is the basis for the argument that the trial court should have considered course of dealing in determining whether there is a genuine issue of material fact making summary judgment dismissing DSA's counterclaim inappropriate. I.C. § 28–1–201(3) provides that "agreement" as used in the UCC, unless the context otherwise requires, "means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing ... as provided in this act (§§ 28–1–205 and 28–2–208)." I.C. § 28–1–205(1) defines "course of dealing" as "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." This is not the concept discussed in *Fairco* and the cases cited in that decision. In those cases, the conduct at issue was "subsequent conduct," that is, conduct subsequent to the agreement in question, rather than "previous conduct," that is, conduct prior to the agreement, as referred to in I.C. § 28–1–205(1). Likewise, in this case, DSA asserts subsequent conduct not previous conduct of the Bank. Therefore, the trial court was correct in not considering course of dealing in determining whether the maturity clause

of the loan agreement should be interpreted as DSA contends it should be.

■ DSA also argues that I.R.E. 406 requires the trial court to consider course of dealing. I.R.E. 406 states:

> Evidence of a habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

This evidentiary rule has no applicability to the circumstances of this case. The issue here is not what the Bank did; we know that. The issue is whether the Bank was entitled to do what it did. This is an issue of substantive law, not an evidentiary issue.

### III.

### THE TRIAL COURT WAS CORRECT IN GRANTING SUMMARY JUDGMENT DISMISSING DSA'S FRAUD CLAIMS.

■ DSA asserts that the trial court should not have granted summary judgment dismissing DSA's claims of fraud and constructive fraud. We disagree.

The only summary judgment granted by the trial court that addressed fraud claims of DSA dismissed the claims alleging fraud and deceit by fiduciaries and constructive fraud to breach duties owed as a result of a confidential and fiduciary relationship. The trial court correctly ruled that there was no fiduciary relationship between the Bank and DSA. *See Bliss Valley Foods,* 121 Idaho at 266, 276–281, 824 P.2d at 851–856.

### IV.

### THE TRIAL JUDGE DID NOT ABUSE HIS DISCRETION IN DENYING DSA'S DISQUALIFICATION MOTIONS.

■ DSA asserts that the trial judge should have disqualified himself. We hold that the trial judge did not abuse his discre-

tion in denying DSA's motions for disqualification.

DSA moved several times to disqualify the trial judge on the ground that the judge was biased and prejudiced. Whether the trial judge disqualified himself was within his sound discretion. *Sivak v. State,* 112 Idaho 197, 206, 731 P.2d 192, 201 (1986). In addressing these motions, the trial judge demonstrated that he understood this was a discretionary matter, he acted within the boundaries of his discretion and consistent with the legal choices available to him, and he reached his denial of the motions by an exercise of reason. Therefore, we conclude that he did not abuse his discretion. *See Sun Valley Shopping Ctr., Inc. v. Idaho Power Co.,* 119 Idaho 87, 94, 803 P.2d 993, 1000 (1991).

### V.

### DSA WAS NOT ENTITLED TO A JURY TRIAL TO DETERMINE THE DEFICIENCY.

■ DSA asserts that it was entitled to a jury trial to determine the amount of the deficiency judgment. We disagree.

■ A claim of foreclosure by a bank and the defenses raised by the borrowers, are part of the equitable foreclosure proceedings that are triable to the court and not to a jury. *Bliss Valley,* 121 Idaho at 274–275, 824 P.2d at 849–850. DSA would have us distinguish the issues surrounding the determination of the amount of the deficiency in this case because the Bank had already seized and disposed of DSA's assets that secured the loans. We reject this distinction.

In *Steed I,* the Court ruled that DSA was entitled to a jury trial on its compulsory legal counterclaims. 115 Idaho at 249–50, 766 P.2d at 719–20. The determination of the deficiency amount did not involve compulsory legal counterclaims, but only the determination of the amount that remained owing to the Bank after the sale of the collateral that secured the loans.

## VI.

### THE FINDINGS OF FACT ESTABLISHING THE AMOUNT OF THE DEFICIENCY WERE NOT CLEARLY ERRONEOUS.

■■■ DSA asserts that the Bank did not prove the amount of the deficiency with reasonable certainty. We disagree.

The trial court made findings of fact establishing the amount of the deficiency. Pursuant to I.R.C.P. 52(a) we may not set these findings aside unless they are clearly erroneous. The findings are supported by substantial competent evidence and are not clearly erroneous.

## VII.

### THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN DETERMINING THE AMOUNT OF ATTORNEY FEES TO AWARD TO THE BANK.

DSA asserts that the trial court abused its discretion in determining the amount of attorney fees to award to the Bank. We disagree.

The trial court considered the evidence offered on the question of the amount of attorney fees to award and discounted the amount requested by the Bank significantly. The trial court did not abuse its discretion.

## VIII.

### CONCLUSION.

We affirm the trial court's summary judgment and deficiency judgment, including the award of attorney fees.

We award the Bank costs and attorney fees on appeal.

BAKES, C.J., McDEVITT, J., and SCHROEDER and BAIL, JJ. Pro Tem., concur.