860 P.2d 634

**Sharon K. SMITH, Plaintiff–Respondent,**

**v.**

**Vernon K. SMITH, Defendant–Appellant.**

**No. 19957.**

Supreme Court of Idaho,
Twin Falls, March 1993 Term.

Aug. 26, 1993.

Rehearing Denied Oct. 25, 1993.

432

B.E. Behrmann, Emmett, for defendant-appellant.

Swafford Law Office, Chtd., Idaho Falls, for plaintiff-respondent. Ronald L. Swafford argued.

TROUT, Justice.

## I.

### BACKGROUND AND PRIOR PROCEEDINGS

This is an appeal in a divorce action between Vernon K. Smith (Vernon) and Sharon Kay Smith (Sharon). Vernon and Sharon began living together in 1972 and were married on June 9, 1979. The parties' only child is Vernon K. Smith III, who was born on October 15, 1980. The parties separated on August 1, 1989, and Sharon filed for divorce on January 11, 1990, alleging adultery and extreme cruelty under I.C. §§ 32–604, –605.

On January 12, 1990, Sharon served Vernon with discovery. Vernon responded to the complaint and disputed the allegations while asserting the defenses of statute of limitations and condonation. Vernon did not respond to Sharon's interrogatories.

On May 4, 1990, the court held a hearing on the issues of child support and maintenance. The court heard testimony from both parties, including Vernon's testimony admitting numerous instances of adultery. The court granted maintenance to Sharon, finding adultery and cruelty on Vernon's part, and on May 30, the court ordered Vernon to pay $718.08 in child support and $1,200.00 in temporary maintenance each month. The first payment was to be made on June 1, 1990.

On June 22, 1990, the court orally granted Sharon's motion to compel discovery and ordered Vernon to respond within ten days. Again, on July 12, the court ordered Vernon to respond to interrogatories within ten days. On August 6, 1990, the trial court found that Vernon had willfully and intentionally refused to obey the court's order to answer Sharon's interrogatories and ordered that Vernon's answer and counterclaim be stricken. The court also indicated that it would have a criminal contempt hearing against Vernon for nonpayment of child support.

In its decision of August 6, 1990, the court granted Sharon partial summary judgment on the divorce issue, finding adultery and extreme cruelty. The court based its grant of summary judgment on Vernon's testimony of numerous adulterous relationships and his failure to prove condonation or that the statute of limitations applied.

In a conference call on August 13, 1990, the court denied Vernon's motion to reinstate his pleadings because he had not answered Sharon's interrogatories. On August 23, 1990, the court issued an order for contempt against Vernon finding that he had not paid any child support or spousal maintenance by July 11, 1990. The court then sentenced him to thirty days in jail to begin on September 7, 1990. The court noted that it might suspend the sentence if Vernon paid all the support that was due.

On October 2, 1990, Vernon filed a motion for disqualification along with an affidavit from Donna Applegate. The affidavit stated that Applegate had spoken to Judge Eismann about the Smith case for a number of hours and alleged that the judge was biased. At trial on October 4, 1990, Judge Eismann stated the circumstances of his conversation with Applegate and denied Vernon's motion for disqualification.

The court heard testimony in this case on October 4, 5, 10 and 11, 1990. The trial court filed its memorandum decision on December 6, 1990, and issued modified findings and a judgment on February 11, 1991. Vernon appealed to the district court, and the district judge, acting in an appellate capacity, affirmed the decision of the magistrate judge. Vernon then appealed to this Court.

## II.

### JUDGE EISMANN DID NOT ABUSE HIS DISCRETION BY REFUSING TO DISQUALIFY HIMSELF AT VERNON'S REQUEST

Vernon argues that Judge Eismann was biased and should have disqualified himself. In support of this argument Vernon has presented the affidavit of Donna Applegate. In her affidavit, Applegate stated that she had known Vernon and Sharon

since about 1972 and that she went to high school with Judge Eismann. She said she contacted the Judge concerning some name genealogy research she was doing and later visited his home in Murphy because of her interest in Idaho history. Applegate stated that she "spoke at length" about the Smith case with Judge Eismann and his wife. During their conversation, she told the Judge that Sharon was dishonest, deceptive and evil, among other things.

Applegate also stated that Judge Eismann expressed his opinion about what was the best form of custody arrangement for children. She stated that he commented on Vernon's involvement with other women during the marriage and made reference to specific incidents. Based on this conversation, Applegate concluded that Judge Eismann was biased against Vernon.

Before the trial commenced, Judge Eismann discussed on the record his conversation with Applegate in explaining his reasons for denying Vernon's motion to disqualify. His statements about what had occurred differed significantly from Applegate's version. He agreed that Applegate had contacted him and made arrangements to visit his home; and that she originally brought up the divorce issue and asked if he were the judge in the Smith case. He further agreed that he had mentioned some facts which had come out at the earlier motion hearing at which the parties' divorce was granted. He also stated that Applegate made derogatory remarks about Sharon's character throughout their conversation, while commenting on how much she liked Vernon. He denied having any discussion with Applegate about the particular merits of this case, including custody issues.

The Idaho Code of Judicial Conduct states that a judge should abstain from public comment about a pending case. Code of Judicial Conduct, Cannon 3(A)(6). It is undisputed that Judge Eismann discussed some aspects of the Smith case with Applegate while the case was still pending before the court. It is a matter of some concern that a trial judge would discuss a case with a third party while the case is pending, and unfortunately doing so may result in exactly the kind of problem with which we are faced in this instance. However, this impropriety on the part of the magistrate does not in and of itself show bias.

The Code of Judicial Conduct outlines when judges must disqualify themselves because of bias. Judges should disqualify themselves if they have a personal bias concerning a party or personal knowledge of disputed facts and deem that their impartiality might be reasonably questioned. Cannon 3(C)(1)(a). The decision to deny a motion for disqualification on the grounds of prejudice and bias is within the sound discretion of the trial court. *Idaho First Nat'l Bank v. David Steed & Assoc.*, 121 Idaho 356, 363, 825 P.2d 79, 87 (1992). The issue is whether the trial judge understood that the decision was a discretionary matter, acted within the boundaries of his discretion and consistent with the available legal choices, and reached his denial of the motion by an exercise of reason. *Id.*

In ruling on the motion to disqualify, Judge Eismann stated he was not biased against either party and indicated that he could act impartially. In his conversation with Applegate, Judge Eismann mentioned previous testimony about adultery, a matter which had already been settled at the earlier hearing and did not involve disputed facts. Eismann also agreed with Applegate that it is generally not in a child's best interests to alternate custody on a weekly basis. There is no indication from either of these remarks that Judge Eismann's subsequent decisions with respect to property division or custody were influenced by the discussion with Applegate; nor is there a showing that any of Judge Eismann's decisions were influenced by bias against Vernon. The only comments reflecting any bias came directly from Applegate and were directed against Sharon. The judge mentioned those on the record to Sharon and offered to recuse himself if she questioned his impartiality; she declined this invitation. Accordingly, there was no showing of bias and Judge

Eismann did not abuse his discretion by refusing to disqualify himself.

■ Vernon also suggests that Judge Eismann was biased because Eismann's father was allegedly a law partner of Sharon's attorney's brother. There is no merit to this contention. The Code of Judicial Conduct states that judges should disqualify themselves if a person within the third degree of relationship to them is acting as a lawyer in the proceeding. Cannon 3(C)(1)(d). "[T]he fact that a lawyer in a proceeding is affiliated with a law firm with which a lawyer-relative of the judge is affiliated does not of itself disqualify the judge." Cannon 3(C)(3)(d). In the present case, Judge Eismann is not related to Sharon's attorney, Ron Swafford. Furthermore, under the Judicial Code, even assuming that Judge Eismann's father and Swafford's brother are law partners, this relationship is not sufficient to disqualify the Judge.

## III.

### SUBSTANTIAL, COMPETENT EVIDENCE SUPPORTS THE TRIAL COURT'S FINDING WITH RESPECT TO COMMUNITY OWNERSHIP OF PROPERTY AND VALUE OF ASSETS

■ This Court reviews the decision of a magistrate judge independently of a district judge sitting in an appellate capacity, but with due regard to the district judge's ruling. *McNelis v. McNelis*, 119 Idaho 349, 351, 806 P.2d 442, 444 (1991). In this case, the magistrate judge, as the trier of fact, was in the best position to assess the credibility of the evidence presented. *See Rice v. Hill City Stock Yards Co.*, 121 Idaho 576, 579, 826 P.2d 1288, 1291 (1992). For this reason, the findings of the trial court will be upheld if supported by substantial, competent though conflicting evidence. *Id.; see also Jones v. Jones*, 117 Idaho 621, 626, 790 P.2d 914, 919 (1990).

### A. CASH ASSETS ALLEGEDLY TAKEN BY SHARON

■ Vernon argues that the trial court should have considered cash funds that

Sharon allegedly took from the law office. Generally, expenditures and indebtedness that occur during the marriage are presumed to be for the benefit of the community. *See Simplot v. Simplot*, 96 Idaho 239, 246, 526 P.2d 844, 851 (1974). Vernon did not present any credible evidence to indicate that Sharon took such cash funds, or that she spent such funds on something other than the community. Thus, Vernon did not overcome the applicable presumption and the trial court did not err by refusing to include the alleged cash as part of Sharon's distributive share of the community assets.

### B. THE IDAHO CITY MINING PROPERTY

■ Vernon argues that the community did not own certain mining property in the vicinity of Idaho City. Property acquired during the marriage is presumed to be community property. *Shill v. Shill*, 115 Idaho 115, 118, 765 P.2d 140, 143 (1988); *Winn v. Winn*, 105 Idaho 811, 813, 673 P.2d 411, 413 (1983). Likewise, a debt incurred during marriage is presumed to be a community debt. *Simplot*, 96 Idaho at 246, 526 P.2d at 851. More specifically, property acquired with proceeds of a loan obtained by one spouse during marriage is community property. *Sheppard v. Sheppard*, 104 Idaho 1, 23, 655 P.2d 895, 917 (1982). The party asserting that the property is separate has the burden of showing with reasonable certainty that the property is separate. *Winn*, 105 Idaho at 813, 673 P.2d at 413.

■ The record indicates that during the marriage Vernon borrowed part of the funds necessary to purchase the mining property in Idaho City from his mother, Victoria Smith. Vernon testified that he gave the money to Lloyd McKay to purchase the property, and that he had an "understanding" with McKay that they would own the property together. Vernon did not offer evidence to show that his debt to Victoria Smith was his personal separate obligation; nor did he provide evidence to

show that the property acquired was separate. Accordingly, substantial and competent evidence supports the trial court's finding that the Idaho City mining property was a community asset.

 Vernon also argued that the trial court erred by overvaluing the mining property. The trial court's valuation is consistent with the evidence presented at trial. The court considered an appraisal from 1983, a real estate listing from 1989 and Vernon's personal assessment of the value in determining how much the mining property was worth. Thus, there was substantial, competent evidence to support the trial court's finding with respect to the value of the mining property.

## C. LEAF CUTTER BEE BOARDS

 Vernon argues that the trial court erred in finding that the community owned all of the leaf-cutter bee boards [1] and in overvaluing these boards. Vernon claimed that the community owned less than one-third of the bee boards and that the rest of the boards were owned by a partner, William J. Van Handle, and by his father's estate. Vernon also testified that the boards were worth, at most, ten dollars each.

Sharon testified that she had worked with the bee boards since she met Vernon in 1972 and that the parties maintained and managed the boards during the marriage. She stated that the boards are usable from five to seven years and that none of the bee boards in use at the time of the divorce had existed before the marriage. Sharon testified that neither Victoria Smith, nor the estate of Vernon Smith Sr., had any interest in the boards. She also testified that no proceeds of the bee business had gone to Van Handle since 1984. Finally, Sharon testified that the community owned over five hundred boards worth about forty dollars each.

The trial court found that the community owned all the bee boards because the community managed all the boards and re-

1. Bee boards are wooden boards which have been drilled with holes for housing bees. Farm-

tained the profits. The court noted that the bees die off each year and that the boards must be replaced every six to seven years; accordingly, the court found there was no competent evidence to show that the estate of Vernon Smith Sr. had any interest in the current bee boards or in the bees which inhabit them. The court estimated the value of each board at forty dollars and awarded Sharon half of this value. The trial court was in the best position to judge the credibility of Vernon's and Sharon's testimony and apparently found Sharon's testimony to be more credible. *See Rice v. Hill City Stock Yards Co.,* 121 Idaho at 579, 826 P.2d at 1291. There is substantial and competent, though conflicting, evidence to support the trial court's finding with respect to the ownership and value of the bee boards.

## D. THE ACCOUNTS RECEIVABLE

 Vernon argues that the trial court erred in estimating the value of the accounts receivable. At the time Sharon filed for divorce, Vernon had uncollected accounts of approximately $680,881.11. Sharon testified that she had handled the accounts as office manager and secretary for Vernon, and was active in collection of the accounts along with Vernon and his other secretary, Carolyn Puckett, until December of 1989. Based on this experience, she considered each account and determined that $251,814.22 of the total accounts receivable was not collectible. Vernon testified that the accounts were "worthless" but did not present specific evidence to contradict Sharon's estimate. In fact, by testifying that he needed the accounts to maintain his law office, Vernon demonstrated that the accounts had at least some value.

The court initially found that the accounts receivable should be valued at $429,066.89 based on Sharon's estimate. In its modified finding of facts, the court reduced the assessed value of the accounts to $273,423.00, by estimating the amount of federal and state tax that Vernon would have to pay on this income. The court made this finding even though Vernon did not pres-

ers pay a fee to have these boards placed near fields for pollination purposes.

ent any expert testimony at trial concerning future income taxes on the accounts.

Considering the evidence presented by the parties, the trial court was left in the difficult position of deciding which of the two questionable valuations seemed most reasonable. Vernon maintained that the accounts with a face value of approximately $681,000.00 were worth nothing, while Sharon gave an estimate of $429,066.00 based on her experience in managing the accounts. Under these circumstances the court chose the most reasonable value which the evidence would support. Accordingly, the trial court's finding is supported by substantial and competent evidence.

### E. MISCELLANEOUS OTHER PROPERTY

Vernon argues that his father's estate owned the law books in his office and that the trial court overvalued these books. He also contests the trial court's valuation of certain milling equipment and the ownership of various specific items of household property.

Vernon testified that when he opened his law practice in 1972, the law books in his father's office, if there were any, were old and outdated. The evidence at trial indicated that the community paid for law book supplements and that Sharon, as office secretary, was in a position to estimate the value of the supplements. Sharon testified to the value of the milling equipment based on Vernon's price list of this equipment. She also testified concerning the household items which Vernon claimed as his separate property. After reviewing the record, we find substantial and competent evidence supports the trial court's finding with respect to the value and ownership of the law books, the milling equipment, and the various household items listed by Vernon.

## IV.

### THE TRIAL COURT CORRECTLY FOUND SHARON WAS ENTITLED TO REIMBURSEMENT FOR THE VALUE OF HER SEPARATE PROPERTY.

From 1972 to 1989, Vernon and Sharon lived in a house at 2001 North Raymond Street in Boise. Sharon purchased the house in 1972, before she and Vernon began dating, and her name alone appeared on the deed. In 1984, the parties took out a $25,000.00 loan secured by a second mortgage on the house. In 1990, the IRS foreclosed on the house to collect taxes, including income taxes, which were not paid during the parties' marriage. Victoria Smith bought it for $40,000.00 (subject to the first mortgage of $10,000.00 and the second which had a balance of between $10,000.00 and $17,000.00). The value of the house at the time of the IRS sale was approximately $70,000.00.

The trial court found that the house was Sharon's separate property and that she was entitled to reimbursement because it was forfeited to pay a community debt. The court awarded Sharon $60,000.00 credit against the community, which was the value of the house less Sharon's separate obligation under the first mortgage. The court did not consider the second mortgage on the house because it was a community obligation and the trial court concluded from the evidence that after foreclosure, the bank would not be successful in obtaining a deficiency judgment against Vernon or Sharon personally.

On appeal, Vernon argues that the trial court erred in finding that the house was Sharon's separate property and in reimbursing Sharon for the full value of the house.

Substantial, competent evidence supports the court's finding that the Raymond Street house was Sharon's separate property. Sharon purchased the home before the marriage and her name appears on the deed. There is no evidence that Sharon gave the house to the community. In fact sometime between their marriage and the execution of the second mortgage loan documents, Vernon signed a deed quitclaiming any interest he might have in the house. Thereafter the property was taken involuntarily through a foreclosure sale by the IRS.

The trial court correctly found that Sharon was entitled to reimbursement from the community for the value of her loss because her separate property was taken to satisfy a community debt. *See In re Estate of Freeburn*, 97 Idaho 845, 850, 555 P.2d 385, 390 (1976); *Ustick v. Ustick*, 104 Idaho 215, 222, 657 P.2d 1083, 1090 (Ct. App.1983). For this reason, Sharon was entitled to $60,000.00 in reimbursement from the community. The trial court correctly deducted this amount from the community property before calculating the net community property available for equal division between the parties. Thus we find no error in the trial court's findings or calculations.

## V.

### THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN MAKING AN UNEQUAL AWARD OF ASSETS BASED ON COMMUNITY EXPENDITURES ON THE BEE WAREHOUSE

Vernon argues that the trial court erred in making an unequal award of property based on improvements made to a warehouse during the marriage. The warehouse, owned by Victoria Smith, was used by the parties to store leaf-cutter bee boards. The court awarded Sharon $30,000.00, roughly half of the value of the bee warehouse, based on the value of improvements made to the warehouse with community assets.

A court shall make an equal division of the value of community property, "[u]nless there are compelling reasons" to do otherwise. I.C. § 32-712(1)(a); *Ross v. Ross*, 117 Idaho 548, 554, 789 P.2d 1139, 1145 (1990). The determination whether there are compelling reasons to justify an unequal division of community property is within the discretion of the trial court. *Maslen v. Maslen*, 121 Idaho 85, 89, 822 P.2d 982, 986 (1991). This determination

will not be overturned on appeal absent an abuse of discretion. *Id.* The test of whether a trial court has abused its discretion is:

(1) whether the lower court rightly perceived the issue as one of discretion;

(2) whether the court acted within the outer boundaries of such discretion and consistently with any rules applicable to specific choices; and

(3) whether the court made its decision by an exercise of reason.

*Id., quoting Hentges v. Hentges*, 115 Idaho 192, 195, 765 P.2d 1094, 1097 (Ct.App.1988).

In the case at bar, the trial court concluded there were "compelling reasons to make an unequal division of property and debts." The court found that at least $60,000.00 in community assets were spent to improve the bee warehouse during the marriage and through these assets, the warehouse was transformed from a building of minimal value to a two-story, $60,000.00 structure. The improvements included a kitchen, dressing room, full-sized bath and hot tub. Vernon had full access to and use of the warehouse, and depreciated the building on his tax returns. The trial court concluded that, based on his expenditures on improvements, Vernon expected to have the use of this building in the future. For these reasons, the court found it would be equitable to make an adjustment for the community expenditures on the bee warehouse.

By noting "compelling reasons" for its decision, the court indicated that it perceived the issue of unequal property division as one of discretion. The court cited a number of cases which supported its position, showing that it acted consistently with applicable rules.[2] Although the cases cited are not directly on point, they indicate a trial court has the equitable power to reimburse the community for the value of improvements from which only one party will

---

2. The court cited *Suchan v. Suchan*, 106 Idaho 654, 661, 682 P.2d 607, 614 (1984) (community was entitled reimbursement for improvements made to the property of one party's parents, where there was a tacit agreement that the party

would eventually acquire the property), and *Shellhorn v. Shellhorn*, 80 Idaho 79, 326 P.2d 64 (1958) (wife awarded interest in real property that her deceased husband had purchased for his son with community funds.)

benefit. Finally, the court's decision was reasonable. After considering all the facts of the case and determining that Vernon would have the use of the warehouse in the future, the trial court concluded that Vernon alone would get the benefit of a considerable expenditure of community funds. For this reason, the court concluded it would be equitable to award Sharon some compensation from the community. Under these facts we find that the trial court did not abuse its discretion.

## VI.

### THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY MAKING AN UNEQUAL AWARD OF COMMUNITY ASSETS BASED ON THE SETTLEMENT IN THE ROYAL VON PUCKETT CASE

Vernon represented Royal Von Puckett in a case in which Puckett was awarded $180,500.00, including $40,000.00 in punitive damages. The parties settled for approximately $156,000 to avoid an appeal. Under the hourly fee arrangement he had with Puckett, Vernon earned approximately $94,000.00 but, because of the reduced amount of the settlement, Vernon agreed to take $40,000.00 as payment for his services.

The trial court found that the fees were a community asset because Vernon represented Puckett during the marriage. The court indicated Vernon's settlement for less than his hourly fee did not necessarily prove fraud. However, because Vernon settled for a sum less than a one-third contingent fee, and less than half of his hourly fee, the court concluded that Vernon's settlement was fraudulent as to Sharon and awarded her $6,083.50.[3]

■ The determination whether there are compelling reasons to make an unequal division of community property is within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *Maslen*, 121 Idaho at 89, 822

P.2d at 986. The marital relationship imposes the high duty of care of a fiduciary upon each of the parties which continues until the moment of the marriage's termination. *Golder v. Golder*, 110 Idaho 57, 60, 714 P.2d 26, 29 (1986).

■ In the present case, the trial court perceived unequal division of property as an issue of discretion and acted within the outer boundaries of such discretion. The court found that Vernon acted fraudulently and breached his fiduciary duty to Sharon by disposing of a community asset for inadequate consideration. The court reasonably valued the community asset based on a one-third contingent fee arrangement. Accordingly, we find the trial court did not abuse its discretion.

## VII.

### THE TRIAL COURT DID NOT ERR BY GRANTING SHARON A JUDGMENT AGAINST VERNON WHICH WAS TO BE SATISFIED THROUGH INSTALLMENT PAYMENTS

Vernon argues the trial court erred by awarding Sharon a judgment instead of dividing the community assets evenly between the parties. On appeal, Vernon also argues that the court erred by ordering excessive installment payments over an unreasonably short period of time.

■ The trial court should, if possible, distribute community property so as to give each spouse the immediate control of their determined share. *Lawson v. Lawson*, 87 Idaho 444, 449–50, 394 P.2d 1008, 1011 (1964). The trial court may order that a cash award be paid by one party to the other in the form of installment payments in order to equalize the distribution of community assets. *See Beesley v. Beesley*, 114 Idaho 536, 758 P.2d 695 (1988); *see also Lawson*, 87 Idaho at 450, 394 P.2d at 1011; *Sherry v. Sherry*, 111 Idaho 185, 187, 722 P.2d 494, 496 (Ct.App.1986). In *Beesley*, a wife received a portion of her husband's

---

**3.** This award is one-half the difference between the amount the community would have received based on a one-third contingent fee ($52,167.00) and the amount for which Vernon settled ($40,000.00).

military retirement benefits in a divorce action. Her share was granted through a lump sum payment of the present value of these benefits, which the husband was to pay through installment payments. Under these circumstances, the Court found that the wife was entitled to interest on the installment payments. *Beesley,* 114 Idaho at 541, 758 P.2d at 700.

■ In the present case, the trial court concluded that the parties' stock in closely held corporations could not be divided. *See Sherry,* 111 Idaho at 187, 722 P.2d at 496. The court awarded Vernon the stock and gave a judgment to Sharon because Vernon was a business associate of the principal stockholder of the corporations at issue. Similarly, the court awarded Vernon the bee boards because he had access to the facilities for operation of the bee business. Finally, the court awarded Vernon the accounts receivable because Sharon would need Vernon's assistance to collect the accounts,[4] and Vernon stated that the income from the accounts was necessary to the operation of his law office. Under these circumstances, the trial court did not err by awarding Vernon the community assets and granting Sharon a cash judgment against him.

Vernon also argues that he was not given sufficient time to pay the substantial judgment against him. The trial court found that it would be an undue hardship to require Vernon to pay the entire lump sum of the judgment immediately. Accordingly, the court ordered Vernon to pay a minimum of $1,500.00 per month and the entire balance of $202,526.13 within eighteen months of the court's decision.

■ In general, the trial court is vested with wide discretion in the division of community property. *Simplot v. Simplot,* 96 Idaho at 245, 526 P.2d at 850. It is within the trial court's discretion to determine a reasonable length of time for a party to make installment payments on a debt arising from the division of community property. *See Larson v. Larson,* 95 Idaho 376, 378–79, 509 P.2d 1297, 1299–1300 (1973), *overruled on other grounds, Rice v. Rice,*

103 Idaho 85, 87, 645 P.2d 319, 321 (1982); *Josephson v. Josephson,* 115 Idaho 1142, 772 P.2d 1236 (Ct.App.1989), *overruled on other grounds, Bell v. Bell,* 122 Idaho 520, 835 P.2d 1331 (Ct.App.1992).

■ In the case at bar, the trial court was in a position to make a reasonable determination of Vernon's ability to meet the payment schedule, based on the evidence presented at trial. The court viewed the issue as one of discretion, acted within the boundaries of such discretion, and determined that Vernon had the ability to make the installment payments. Accordingly, under the test enumerated in *Maslen v. Maslen,* 121 Idaho at 89, 822 P.2d at 986, we find that the trial court did not abuse its discretion.

## VIII.

### THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY JAILING VERNON FOR CONTEMPT OF COURT

■ The trial court jailed Vernon for failing to comply with the court's order to pay child support and spousal maintenance. There is ample evidence in the record to support the trial court's decision. The court ordered Vernon to make support and maintenance payments starting on June 1, 1990. Vernon did not make any maintenance payments and did not make any child support payments until August 8, 1990, the day before the contempt hearing. The record indicates that Vernon persistently refused to comply with the orders of the trial court. Accordingly, the trial court did not err by finding Vernon in contempt and incarcerating him to obtain compliance with its orders.

## IX.

### THE TRIAL COURT PROPERLY REJECTED THE DEFENSE OF CONDONATION AND THE STATUTE OF LIMITATIONS AS TO THE ISSUE OF ADULTERY

■ In its decision of June 4, 1990, the trial court granted summary judgment to

---

4. The evidence indicated that Vernon was still representing some of the clients with substantial

outstanding accounts and maintained a close relationship with many of his other clients.

Sharon on the issues of adultery and extreme cruelty. Vernon argues that the trial court erred by not applying the defense of condonation. We find the trial court's decision is directly consistent with *Fischer v. Fischer*, 92 Idaho 379, 443 P.2d 463 (1968). The court found that Sharon did not condone Vernon's treatment of her merely because she chose to endure it for a number of years before seeking a divorce. *See Fischer*, 92 Idaho at 385–86, 443 P.2d at 469–70.

Vernon also argues that the divorce based on adultery is barred by the statute of limitations under I.C. § 32–615. A divorce action based on adultery must be brought within two years of the commission of the adulterous act, or after its discovery by the injured party. I.C. § 32–615(1). Here, the trial court was in the best position to view the evidence and determine the credibility of the evidence presented by the parties. *See Rice v. Hill City Stock Yards Co.*, 121 Idaho at 579, 826 P.2d at 1291. The court found that Sharon did not "discover" Vernon's affair with Kelly Doyle until May of 1989, within two years of the time she filed the divorce action. The court also found that Sharon never discovered many of Vernon's other acts of adultery. After reviewing the record, we find that substantial and competent evidence supports the trial court's finding that Sharon brought this action within two years of discovering Vernon's adultery. Accordingly, the trial court did not err in granting the divorce on that basis.

### X.

### THE TRIAL COURT MUST STATE THE REASONS FOR AWARDING ATTORNEY FEES ACCORDING TO I.C. § 32–705

The trial court included Sharon's attorney fees as part of the community debt according to *Murphey v. Murphey*, 103 Idaho 720, 653 P.2d 441 (1982). The decision in *Murphey* was based on *Mifflin v. Mifflin*, 97 Idaho 895, 556 P.2d 854 (1976). The decision in *Mifflin*, in turn, was based on versions of I.C. § 32–704 and I.C. § 32–708 which were amended in 1980. The amendments removed the requirement that attorney fees be satisfied from community assets. *Beesley*, 114 Idaho 536, 542 n. 7, 758 P.2d 695, 701 n. 7 (1988). The trial court must cite the basis for its award of attorney fees in a divorce action after considering the factors set forth in I.C. § 32–705. *Id.* at 542–43, 758 P.2d at 701–02.

In the present case, the trial court stated that Sharon offered evidence of her attorney fees while Vernon did not. The court did not cite the factors listed in I.C. § 32–705 as a basis for including Sharon's fees as part of the community debt. Accordingly, we reverse the trial court's award of attorney fees and on remand, the court should consider the factors in I.C. § 32–705 in determining whether Sharon is entitled to her attorney fees.

### XI.

### SHARON IS NOT ENTITLED TO ATTORNEY FEES ON APPEAL

Vernon presented a number of legitimate legal issues on appeal. Accordingly, we do not believe an award of attorney fees on appeal is appropriate in this case.

### XII.

### CONCLUSION

The decision of the trial court is affirmed in part and reversed in part. This case is remanded to the trial court to make findings consistent with this opinion. Respondent is awarded her costs.

McDEVITT, C.J., JOHNSON, J. and MEEHL, D.J. (pro tem.) concur.

BISTLINE, J., concurs in the result.