669 So.2d 622 (1996)
Emile Anthony BARROW, Jr., Plaintiff-Appellant,
v.
Jennifer Martin BARROW, Defendant-Appellee.
No. 27714-CA.
Court of Appeal of Louisiana, Second Circuit.
February 28, 1996.
Rehearing Denied March 28, 1996.
*624 McLeod & Verlander by Robert P. McLeod and Rick W. Duplissey, Monroe, for appellant.
Kneipp & Hastings by Donald L. Kneipp, Monroe, for appellee.
Before NORRIS, BROWN and WILLIAMS, JJ.
NORRIS, Judge.
Dr. Emile Barrow appeals the trial court's judgment partitioning the community which formerly existed between him and Jennifer Martin Barrow. Mrs. Barrow has answered the appeal, assigning her own errors. For the following reasons, we amend in part and as amended affirm.

Facts
Dr. Emile Barrow and Jennifer Martin were married in Alexandria on November 14, 1987, and thereafter resided in Monroe. Dr. Barrow filed for a divorce and partition of the community on January 15, 1993. The court rendered a judgment of divorce on August 4, 1993, terminating the community retroactive to January 15. Prior to trial, the court appointed a notary/referee, Charles A. Traylor, III, to attempt to settle the community and to prepare a written report based on the information submitted by the parties. The matter went to trial in June 1994; the trial court rendered written reasons for judgment and signed a final judgment partitioning the community on November 30 and December 16, respectively.
The trial court found a total community net worth of $680,867.29, of which $340,433.64 was to be allocated to each spouse. It allocated to Dr. Barrow assets of $671,752.05 and debts of $31,564.57; and to Mrs. Barrow only assets of $40,679.81. Thus, the court ordered an equalizing payment of $299,753.83 to Mrs. Barrow. In addition, it allowed reimbursement claims in the amount of $113,602.35 to Dr. Barrow and $149,279.98 to Mrs. Barrow, and ordered Dr. Barrow to pay her the difference, or $35,677.63. All totaled, Dr. Barrow was ordered to pay $335,431.46.
Each party on appeal disputes the trial court's rulings which classify and value certain items (to be discussed at length below in connection with each assignment) and allow or disallow many reimbursement claims. Herein, we address several major issues involving Dr. Barrow's medical practice and educational financial contributions to Mrs. Barrow. Due to the large number of assignments, the remaining issues are treated separately in an unpublished appendix. URCA-Rule 2-16.3.

Discussion
Community property comprises, inter alia, property acquired during the existence of the community regime through the effort, skill, or industry of either spouse. La.C.C. art. 2338. Property acquired during the existence of the marriage is presumed to be community in character, but either spouse may prove otherwise. La.C.C. art. 2340; Reeves v. Reeves, 607 So.2d 626 (La.App.2d Cir.), writ denied 608 So.2d 1010 (1992); Stewart v. Stewart, 585 So.2d 1250 (La.App. 4th Cir.1991), writs denied 590 So.2d 594, 597 (1992). This strong presumption of community may be rebutted only by clear and convincing evidence. Johnson v. Johnson, 582 So.2d 926 (La.App.2d Cir.1991). Separate property comprises, inter alia, property acquired by a spouse prior to the establishment of a community property regime. La.C.C. art. 2341.
La.R.S. 9:2801 governs community property partitions. In allocating community assets and liabilities, the trial court has great discretion to divide a particular asset or liability equally or unequally or to allocate it in its entirety to one of the spouses. The court must consider the nature and source of the asset or liability, the economic condition of each spouse, and any other circumstances that it deems relevant. La.R.S. 9:2801(4)(c); Hare v. Hodgins, 586 So.2d 118 (La.1991); Kambur v. Kambur, 94-775 (La.App. 5th Cir. 3/1/95), 652 So.2d 99. In light of this discretion, the trial court is not required to accept at face value a spouse's valuation of assets or debts, or claims against the community. Cutting v. Cutting, 625 So.2d 1112 (La.App. 3d Cir.1993), writ denied 93-2770 *625 (La. 1/7/94), 631 So.2d 453. An appellate court may not overturn the trial court's factual findings or credibility determinations unless clearly wrong or manifestly erroneous. Stobart v. State, Through Dept. of Transp. and Dev., 617 So.2d 880 (La.1993).

Medical Practice
By his first two assignments, Dr. Barrow contends the trial court erred in classifying his medical practice as community and valuing it at $395,000.
Before his marriage to Jennifer, Dr. Barrow purchased stock in North Louisiana Clinic, Inc. (NLC), along with several other doctors. At this time, the doctors occupied an office building at 401 Hall Street in Monroe, Louisiana. According to Dr. Barrow, each division or specialty also formed its own corporation so he was also a shareholder in Cardiology Associates, Inc. The physicians eventually moved to another location near North Monroe Hospital.
For reasons not entirely clear from the record, in the fall of 1989, about one year after his marriage to Jennifer, NLC disbanded.[1] Thereafter, Dr. Barrow practiced with a cardiologist, Dr. Robin Lake, another member of NLC and Cardiology Associates; they remained at the same location, paying rent for the office space. Dr. Barrow testified that he could not recall whether they practiced under the name of Cardiology Associates at this time. R.p. 1097. On October 1, 1989 Dr. Barrow signed a "Purchase and Sale" agreement, whereby he purchased from NLC the accounts receivable generated by him, one-half of another physician's receivables for $105,066, and certain equipment for $6,362.50.[2] Ex. D-14. To finance the purchase, Dr. Barrow borrowed $150,030 from Hibernia National Bank. Ex. D-15, 16. In early 1990, Dr. Lake left Cardiology Associates and Dr. Barrow purchased his interest in the newly acquired equipment. Since this time, Dr. Barrow has practiced in a sole proprietorship. As of the date of trial, NLC though inactive, was still in existence and in the process of winding up its affairs. Dep. William Harrison, p. 83.
Dr. Barrow argues that despite the corporate arrangement which he used to share expenses, he has always functioned as a sole practitioner, and that NLC merely served as a "conduit," performing administrative functions such as billing, collections and accounting. He contends that NLC's dissolution required that he assume these administrative duties, but did not alter the original separate nature of the practice. Thus, he argues that by real subrogation, C.C. art. 2341, the sole proprietorship retained the separate character of the earlier corporate practice. Mrs. Barrow argues, however, that real subrogation does not apply. She contends that the infusion of a substantial amount of community funds to capitalize his new arrangement when NLC dissolved, makes the practice community. The new proprietorship formed during the marriage is thus presumed to be community property. La.C.C. art. 2340.
Mr. Traylor recommended that the medical practice be classified as community. The trial court agreed, finding that Dr. Barrow failed to overcome the presumption of community. Regarding his real subrogation argument, the court noted that Dr. Barrow began practicing in a different mode after his marriage, borrowed money to buy accounts receivable and equipment from NLC, reported most of these earnings as business income on tax returns, rather than wages, and that NLC was still in existence.
Comment (c) to art. 2341 states the principle of real subrogation, applicable to both separate and community property. "When a thing forming a part of the separate property of a spouse is converted into another thing, the mass of the separate property is not diminished. The new thing takes the place of the old." (citations omitted).
*626 Dr. Barrow relies on Albert v. Albert, 625 So.2d 765 (La.App. 1st Cir.1993), where the court reversed the trial court's finding that an apartment complex was community property. In 1982, Harry Albert's father donated to him all the stock in University Park Apartments, Inc., a corporation whose sole asset was University Park Apartments. In October 1984, the corporation sold the apartment complex to Mr. and Mrs. Clark and Mr. and Mrs. MacDonell; the parties paid part of the sales price and signed a promissory note payable to the corporation for the balance. Eventually the Clarks sold their interest to the MacDonells. In December 1984, Mr. Albert married, and in 1985, the corporation dissolved. In 1987, the MacDonells transferred the complex to Mr. Albert by dation en paiement in cancellation of the promissory note. In reversing, the court reasoned:
According to comment (c), when Mr. Albert sold the complex, the cash and the promissory note took the place of the apartment complex as his separate property. The dissolution of the corporation and the subsequent transfer to Mr. Albert individually did not affect the separate nature of the property. The note held by Mr. Albert represented his separate property interest in the dissolved corporation. The subsequent cancellation of the note in exchange for the apartment complex was a real subrogation of his separate property interests.
Albert v. Albert, supra at 768-769 (citations omitted).
Albert, however, is clearly distinguishable on its facts. There the promissory note acquired by Mr. Albert represented his separate interest in the dissolved corporation, and the complex merely replaced the note. On the evidence presented in the instant case, the trial court found that Dr. Barrow's separate interest in NLC was not converted or transformed into his sole proprietorship. See Downs v. Downs, 410 So.2d 793 (La.App. 3d Cir.), writ denied 414 So.2d 375 (1982); Succession of Hollier, 247 La. 384, 171 So.2d 656 (on rehearing), appeal after remand 184 So.2d 790 (La.App. 3d Cir.), writ denied 249 La. 203, 186 So.2d 160 (1966); Kittredge v. Grau, 158 La. 154, 103 So. 723 (1925) (on rehearing). On the contrary, he borrowed $150,000 to purchase accounts receivable generated by him in large part, if not all, during the existence of the community plus half of another physician's receivables, and certain equipment from NLC. Shortly thereafter, he bought Dr. Lake's interest in the equipment.
In Succession of Hollier, the court of appeal and Supreme Court initially affirmed a trial court holding that one partner's 20 percent interest in a commercial partnership was community property, but on rehearing remanded the case to determine whether the successive partnership interests were merely "transformations" of the previously existing interest or "whether [he] infused community funds into the partnerships during his second marriage." Hollier, 171 So.2d at 659. In doing so, the court was cognizant of its earlier decision in Kittredge v. Grau, supra, that stock acquired by the transformation of a separate interest in the partnership into an interest in the corporation was separate property. On remand, the trial court found that the deceased partner's original investment had been periodically "carried over or reduced" in the book entries, but no new capital ever applied. 184 So.2d at 792. The decedent's 20 percent interest was therefore declared his separate property.
In the instant case, the trial court found that Dr. Barrow had not simply converted his interest in NLC into the sole proprietorship, as contemplated by the principle of real subrogation. NLC still exists, albeit inactively, today. Dr. Barrow formed the sole proprietorship with accounts receivable and equipment purchased from NLC with community funds. Further, at the time the community terminated the medical practice consisted of cash or fees earned, accounts receivable generated, and equipment acquired, all during the existence of the community regime. Under these circumstances, we cannot say that the trial court was clearly wrong to classify the medical practice as a community asset.
*627 Dr. Barrow next contends that the court erred in valuing the practice.[3] He urges that the court was clearly wrong not to consider certain items in its calculations, including uncollectible receivables, state and federal income taxes on the receivables, and debts and outstanding checks of the medical practice existing at the time the community terminated. He also disputes the estimates of his interpretation fees and the practice's bank accounts.
The trial court valued the practice at $395,000 based on two exhibits, D-4, a Statement of Assets and Liabilities, and D-5, a closing entry report for December 1992. Exhibit D-4 lists total assets of $357,792.39, which include accounts receivable, cash, furniture and equipment (allowing depreciation of $54,411.17) and bank accounts, and liabilities of $1,472.84 as of January 15, 1993; it omits the element of goodwill, as conceded by Mrs. Barrow. See Pearce v. Pearce, 482 So.2d 108 (La.App. 4th Cir.), writ denied 484 So.2d 140 (1986). To this estimate ($356,319.55), the court added $38,616 for additional interpretation fees that Dr. Barrow earned. This figure represents fees earned in one month based on the average fees he earned in 1992. The court acknowledged but rejected consideration of uncollectible receivables, outstanding checks and taxes, stating "the difficulty for the Court in evaluating such a thing as a medical or personal practice is that any evaluation is transient in that any picture of financial worth is at best a momentary picture changing constantly." R.p. 547.
Though D-4 was prepared by Dr. Barrow's C.P.A. firm at his own request, he disputes its reliability, arguing that the document is not a "financial statement," but merely an unreliable and unverified accounting compilation. In essence, he asserts that it does not provide a complete picture of the practice's financial condition for purposes of assessing value. Dr. Barrow's witness, Bonnie Robinette, a C.P.A. who served as his accountant since July 1993, provided the bulk of the testimony regarding this report, though she did not prepare it. According to Ms. Robinette, D-4 is an accounting compilation based solely on the data submitted to the firm, and is not very reliable. The data is neither verified nor tested for accuracy. Importantly, the statement is prepared on a "cash basis," meaning it does not reflect expenses incurred but not yet paid or income not yet received; it does include bank account balances. Mrs. Barrow introduced no testimony at trial to refute this. On appeal she argues simply that the statement was a valid and proper estimate of the practice's value, and that it was within the trial court's discretion to rely on it.[4]
In valuing a medical practice, as one would a law practice, the cash basis must be converted to an accrual basis to uncover fees and expenses not reflected on an income statement. See Skoloff, The Value of a Law Practice in a Divorce, 73 ABA Journal (March 15, 1987), 38. In determining accounts receivable and work in progress, care must be taken to include only collectible items, and bad debts should be discounted. Id. at 40.
Exhibit D-4 shows $166,277.34 in accounts receivable as of January 15, 1993. However, Minnie McCain, Dr. Barrow's office manager since July 1990, testified that as of January 15, accounts receivable totaled $177,533.06. Dr. Barrow accepts this latter figure, but seeks a deduction for the uncollectible accounts and taxes. At trial, Ms. McCain and Ms. Robinette presented estimates ranging from 50 to 71 percent as to the portion of receivables which Dr. Barrow actually collects. According to Ms. McCain, he collects only 50 to 55 percent due to bad debts and disallowed Medicaid and Medicare charges[5]; *628 this conflicts with her testimony, however, that of the accounts receivable existing as of January 15, 1993, Dr. Barrow was able to collect $112,420.85 or approximately 63 percent.[6] Further, Ms. Robinette disputed Ms. McCain's estimate. Based on her documented analysis of collections between 1990 and mid-1993, she testified the rate was significantly higher, but noted that since it peaked in the latter part of 1991, the rate has steadily fallen. Ex. P-141; R.p. 1036. Ms. Robinette testified, and the evidence shows, that the analysis was based on actual figures of Dr. Barrow's charges and collections furnished to her by Ms. McCain. In computing these figures, Ms. Robinette used the formula recommended in the Guide to Physicians and Other Health Care Professionals, a publication to which Dr. Barrow subscribed. This evidence is obviously more compelling than Ms. McCain's unsupported estimate. Upon review, however, we note that the document does not reflect a steady decline since early 1992, but rather fluctuations in both directions. Significantly, the analysis for 1993 is incomplete. Further, Ms. Robinette admitted that she did not prepare the document until August 1993, though she denied having prepared it in anticipation of this litigation.
Nonetheless, the evidence is uncontradicted that Dr. Barrow does not collect 100 percent of his receivables and that D-4, upon which the trial court relied, does not take into account Dr. Barrow's historical collection ratios. We are thus constrained to find that the trial court erred in failing to allow for uncollectible receivables. Despite its minor discrepancies, Ms. Robinette's summary presents credible proof that Dr. Barrow's average collection rate from 1990 to 1992 was 75 percent. Consequently, we will lower the accounts receivable figure in D-4 to $133,149.79.
Dr. Barrow contends this figure should be further reduced by the amount of state and federal income taxes paid on the receivables collected. Ms. Robinette testified regarding this issue, calculating the tax liability on collectibles of $112,420.85 as of January 15, 1993; the combined state and federal income tax totaled $50,051. Mrs. Barrow presented no countervailing evidence. Ms. Robinette's testimony was the sole evidence presented and the figure does not strike us as unreasonable; Dr. Barrow paid at least this amount in taxes on the accounts receivable. Accordingly, the accounts receivable will be reduced by this amount. Smith v. Smith, 124 Idaho 431, 860 P.2d 634 (1993).
Dr. Barrow also seeks an adjustment of $17,008.08 for existing but unpaid debts of the medical practice not considered by the trial court because not included in D-4, the statement of assets and liabilities. Ms. Robinette testified at length to each debt and the portion incurred prior to January 15. R.pp. 906-923. Dr. Barrow introduced Ex. P-118, which contained the invoices and payments. Mrs. Barrow presented no evidence at trial to refute this, and on appeal argues that it was within the trial court's discretion to disregard these debts. We disagree. The evidence shows that D-4 reflected only those expenses paid before January 15. Thus, we will recalculate the value including debts of the medical practice of $12,859.02, which Dr. Barrow has shown existed on January 15. He is not entitled to include, however, an additional $4,149.06 for his and Mrs. Barrow's personal debts existing at the time of termination which the practice allegedly paid.
Finally, Dr. Barrow claims the court erred in estimating the interpretation fees and in failing to reconcile the bank accounts based on updated bank statements. The trial court averaged the interpretation fees Dr. Barrow earned in 1992 (exhibit D-5) to estimate a monthly fee amount of $38,616, which the court added to Dr. Barrow's assets over and above his receivables. Dr. Barrow contends this was not the best evidence of the fees earned in January 1993. Upon careful *629 review of the exhibits submitted by Dr. Barrow in support of his lower $32,445.07 estimate, however, we find that the trial court did not abuse its discretion. The evidence is not entirely conclusive. For instance, Dr. Barrow introduced a check register showing a February deposit for $12,672 in HCA technical fees; he claims that $5,869 is for work he performed prior to January 15. The only evidence of this fact is handwritten notations made by Ms. McCain, along with her testimony that the amount is correct. In sum, it was within the trial court's discretion in calculating interpretation fees to use an average based on the actual fees Dr. Barrow earned in 1992.
Dr. Barrow urges the trial court erred in failing to update the bank account balances because some checks and deposits had not cleared or been posted at the time the statement was compiled. However, Ms. McCain admitted that she provided the checkbook register to the C.P.A. firm. R.p. 964. This should have reflected the status of the account on January 15. Dr. Barrow has submitted rather detailed exhibits which attempt to reconcile the bank accounts to reflect their actual balance as of January 15, while reiterating the "unverified and inherently inaccurate" nature of his own compilation.[7] Unlike uncollectible receivables and outstanding debts, however, bank account balances are admittedly factored into the compilation. Readily available evidence of deposits that had been made but which were not yet posted, logically should have been submitted to the accountant preparing the compilation. We simply cannot say, on this record, that the trial court abused its discretion by accepting the account balances listed in D-4.
By assignment 55, Mrs. Barrow contends the court undervalued Dr. Barrow's medical practice based on a December 1992 statement indicating equity of $867,766.60. Ms. Robinette testified that D-5 was merely a copy of a journal entry to close the books for December 1992. Further, Mrs. Barrow offered no testimony at trial to explain this equity figure or show how it should be factored into the valuation. This argument lacks merit.
The value of the medical practice will be amended to $298,897.98 to include the cash, bank accounts and assets, but to reflect only the collectible receivables, the income tax thereon, and the payment of certain debts of the medical practice.[8]

Financial Contribution to Education
By assignment 20, Dr. Barrow urges the court erred in denying him reimbursement for his financial contributions during the marriage to Mrs. Barrow's Master's Degree in nursing. Mrs. Barrow began attending Northwestern State University's masters program in the fall of 1989, and obtained her degree in December 1992. The marriage ended on January 15, 1993. The trial court rejected his claim for reimbursement under La.C.C. art. 121, finding that the article does not contemplate the instant situation where Dr. Barrow made no sacrifice to put his wife through school, and never intended to receive any benefit by doing so.
Under C.C. art. 121, the court may award a party a sum for financial contributions made during the marriage to education or training of the other spouse that increased the spouse's earning power, to the extent the claimant did not benefit from the increased earning power during the marriage. This award is discretionary. Factors to consider include (1) the claimant's expectation of shared benefit when the contributions were made, (2) the degree of detriment suffered by the claimant in making the contributions, and (3) the magnitude of the benefit the other spouse received. Spaht, Developments in the Law, 1985-1986: Persons and Matrimonial Regimes, 47 La.L.Rev. 391, 393 (1986).
We find few Louisiana cases which have considered La.C.C. art. 121, and none which *630 have addressed its scope as in the instant case. This court, in fact, most recently determined the proper formula for calculating an award under this article. McConathy v. McConathy, 25,542 (La.App.2d Cir. 2/23/94), 632 So.2d 1200, writ denied 94-0750 (5/6/94), 637 So.2d 1052. There we relied in large part on the case of DeLa Rosa v. DeLa Rosa, 309 N.W.2d 755 (Minn.1981). In DeLa Rosa, the parties were married in California in July 1972. They agreed that Elena would work and support Pedro while he obtained his undergraduate and medical degrees. Elena sacrificed by working full-time, low-paying jobs for the next three years while he attended college in California, and then moved with him to Minnesota so he could attend medical school. Overall, she earned about $8,000 a year during their five-year marriage, all spent on living and educational expenses. Pedro filed for divorce after his second year of medical school. The court allowed her claim for financial contributions made to his education, noting:
The case at bar presents the common situation where one spouse has forgone the immediate enjoyment of earned income to enable the other to pursue an advanced education on a full-time basis. Typically, this sacrifice is made with the expectation that the parties will enjoy a higher standard of living in the future. Because the income of the working spouse is used for living expenses, there is usually little accumulated marital property to be divided when the dissolution occurs prior to the attainment of the financial rewards concomitant with the advanced degree or professional license. * * * The equities weigh heavily in favor of providing a remedy to the working spouse in such a situation. DeLa Rosa, 309 N.W.2d at 758.
The Court of Appeals later considered whether an award, such as that under DeLa Rosa, is warranted on facts similar to those in the instant case. Ellesmere v. Ellesmere, 359 N.W.2d 48 (Minn.App.1984). The court rejected an award for support and educational expenses provided by Frank Ellesmere to his wife during their marriage, finding equitable restitution inappropriate. The court stated:
The issue to be decided here is whether there has been a sacrifice and forgoing of the enjoyment of earned income significant enough to fit within the DeLa Rosa principle for allowing recovery. The facts of this case do not present such a sacrificing couple.
Both parties testified that they lived extravagantly. Frank earned approximately $52,000 each year during the marriage. Unlike the struggling wife in DeLa Rosa, he cannot argue that the cost of his wife's education required substantial sacrifice. Their lifestyle was unaffected by her education. Ellesmere, 359 N.W.2d at 51.
We find this rationale persuasive and particularly applicable in the instant case. Dr. Barrow earned nearly $2,000,000 during the period his wife attended school. Dr. Barrow testified that he never expected to enjoy a higher standard of living upon her receipt of an advanced degree. In fact, he testified that he neither needed nor wanted his wife to work. Throughout her schooling, the Barrows enjoyed an extremely high standard of living. Dr. Barrow suffered no detriment, as he made no substantial sacrifice for her education. The trial court was not plainly wrong in finding La.C.C. art. 121 inapplicable in the instant case and in denying Dr. Barrow reimbursement for educational expenses.

Conclusion
For the reasons expressed herein and in the accompanying unpublished appendix, the judgment is amended and recast as follows:
IT IS ORDERED, ADJUDGED, AND DECREED that the following items, with their respective values set opposite thereto, shall be considered assets of the community regime formerly existing between the parties:

Item Total Value Amended
Medical Practice $395,000.00 $298,897.98
Pension Plans $140,838.20
Life Insurance Policies $ 69,652.24
Bank Accounts:
(a) Central X-XX-XXXXX (interest) $ 977.40

*631
(b) Central X-XX-XXX-X (interest) $ 5,031.99
(c) Premier XXXXXXXXXX (expended) $ 
(d) Premier XXXXXXXXXX (interest) $ 1,752.22
(e) Capital XX-XXXX-X $ 18,425.08
1985 BMW $ 4,500.00
Ranger Boat $ 14,000.00
Jewelry $ 11,970.00
Household and Personal items in possession of Dr. Barrow $ 40,000.00
Household and Personal items in possession of Mrs.
Barrow $ 20,000.00

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the following items, with their respective amounts set opposite thereto, shall be considered debts of the community regime formerly existing between the parties:

Neiman Marcus $ 1,878.58
Central Mastercharge $ 3,569.79
Talbot-Triad $ 880.36
American Express XXXX-XXX-XXX-XXXXX $ 4,080.15
Hewlett-Packard $ 2,275.00
Aspen Publishers $ 66.21
Dallas Trip $ 1,100.00
American Express Optima 3737-068-631-21001 $ 5,441.74
American Express Centurian XXXX-XXXXX-XXXX $ 5,938.60
Chase Mastercard XXXX-XXXX-XXXX-XXXX $ 3,829.42 $ 2736.35
Chase Visa XXXX-XXX-XXX-XXX $ 414.07 $ 4140.71
Century Cellunet $ 40.67
Mosby Nursing $ 83.10
Central Visa $ 2895.78
Attorney Fees $ 33,168.44
Total Community Debts $ 31,564.57[9] $ 68,295.48

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the following are considered community assets and shall be divided equally in kind between the parties (The bank accounts will be divided according to the values listed hereinbelow):

Item
4.2857% Interest in Hall Street Property, including the accompanying debt (2.14285% to each party)

Bank Accounts:
(a) Capital Bank Account XX-XXXX-X ($4,221.75 as of Jan. 15, 1993)
(b) Premier Account XXXXXXXXXX ($4,058.46 as of Jan. 15, 1993)
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the following community assets and debts are allotted to plaintiff, EMILE ANTHONY BARROW, JR.:

Item Total Value Amended
Medical Practice $395,000.00 $298,897.98
Pension Plans $140,838.20
Life Insurance Policies $ 69,652.24
Bank Accounts:
(a) Central X-XX-XXXXX(interest) $ 977.40
(b) Central X-XX-XXX-X $ 5,031.99
(c) Premier XXXXXXXXXX $ 1,752.22

*632
(d) Capital 1402757 $ 18,425.08
1985 BMW $ 4,500.00
Ranger Boat $ 14,000.00
Household and Personal items in his possession $ 40,000.00
 $ 31,564.57 $ 68,295.48
TOTAL TO DR. BARROW $640,187.48 $525,779.63

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the following community assets and debts are allotted to defendant, JENNIFER MARTIN BARROW:

Item
Bank Accounts:
Premier XXXXXXXXXX (expended) $ 8,709.81
Jewelry $ 11,970.00
Household and Personal items in her possession $ 20,000.00
TOTAL TO JENNIFER BARROW $ 40,679.81

thereby making the net worth of the community regime to be Five Hundred Sixty-Six Thousand Four Hundred Fifty-Nine and 44/100 ($566,459.44) Dollars with each party to receive one-half of this amount or Two Hundred Eighty-Three Thousand Two Hundred Twenty-Nine and 72/100 ($283,229.72) Dollars. Therefore, plaintiff, EMILE ANTHONY BARROW, JR., is hereby ordered to pay unto defendant, JENNIFER MARTIN BARROW, an equalizing payment in the amount of Two Hundred Forty-Two Thousand Five Hundred Forty-Nine and 91/100 ($242,549.91) DOLLARS.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that plaintiff, EMILE ANTHONY BARROW, JR., and defendant, JENNIFER MARTIN BARROW, are entitled to certain reimbursement claims. These claims are as follows:

A. Reimbursement claims allowed Emile Anthony Barrow, Jr.:
 Amended
 1. Monies owed prior to marriage $ 15,000.00
 2. Capital bank account XX-XXXX-X $ 40,000.00
 3. Credit card balances paid $ 12,394.98
 4. 1992 Taxes paid $ 38,472.50
 5. Unauthorized gifts-seminars $ 7,734.87
 6. Central bank account 2224917 $ 4,394.36
 7. Nissan 300ZX payments $ 11,338.55
 Total Reimbursement Claims Allowed
 Emile Anthony Barrow, Jr. $113,602.35 $129,335.26
B. Reimbursement Claims Allowed Jennifer Martin Barrow:
 1. Mortgage payments on residence and property $102,799.00
 2. Linda Barrow payments $ 14,000.00
 3. Central Mastercharge XXXX-XXXX-XXXX-XXXX $ 47.00
 4. Hewlett-Packard $ 50.00
 5. Neiman Marcus $ 41.00
 6. Physicians' Development/Hall Street property $ 31,132.82
 7. Improvements to Dr. Barrow's separate property $ 1,038.10
 8. Nissan 300ZX $ 8,960.00
 Total Reimbursement Claims Allowed
 Jennifer Martin Barrow $149,279.98[10] $158,067.92

*633 which entitles defendant, JENNIFER MARTIN BARROW, to a payment of Twenty Eight Thousand Seven Hundred Thirty-Two and 66/100 ($28,732.66) DOLLARS in reimbursement payments, in addition to the above equalizing payment, thereby resulting in plaintiff, EMILE ANTHONY BARROW, JR., owing unto defendant, JENNIFER MARTIN BARROW, the full sum of Two Hundred Seventy-One Thousand Two Hundred Eighty-Two and 57/100 ($271,282.57) DOLLARS.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the 1991 BMW along with its associated debt shall be allocated to JENNIFER MARTIN BARROW; and the leased Mercedes vehicle along with its associated obligation shall be allocated to EMILE ANTHONY BARROW, JR.
The judgment is affirmed as amended. Costs of this appeal are assessed equally between Emile and Jennifer Barrow.
AMENDED AND AFFIRMED.

APPLICATION FOR REHEARING
Before NORRIS, HIGHTOWER, BROWN and WILLIAMS, JJ., and CLARK, J. Pro Tem.
Rehearing denied.
NOTES
[1] According to Dr. Barrow and William Harrison, a C.P.A. consulted on NLC's financial condition, NLC is still in the process of liquidation. Dr. Barrow argues, however, that if the corporation technically continues to exist, it is simply because minor issues remain in the liquidation.
[2] Though this document would suggest otherwise, Dr. Barrow and Mr. Harrison contended that, NLC, in effect, merely assigned the accounts receivable to the physicians as a means of generating cash for NLC. Apart from this testimony, there is no evidence of an assignment.
[3] Though the parties did not expressly stipulate regarding time of valuation, only evidence as to the value of the practice as of January 1993 was submitted. In light of the nature of the asset, the trial court was not plainly wrong. Depner v. Depner, 478 So.2d 532 (La.App. 1st Cir.1985), writ denied 480 So.2d 744 (1986). Moreover, neither party contests this on appeal.
[4] This, along with one or two other documents, constitutes Mrs. Barrow's meager evidentiary showing as to the value of the medical practice. The record is remarkably devoid of any testimony by an independent expert or appraisor as to the value of the medical practice.
[5] The collectibility of receivables is affected to an extent by Medicare. See R.pp. 992-996. Ms. McCain estimated that about 85% of Dr. Barrow's practice is Medicare. R.p. 926.
[6] Ms. McCain testified that shortly after Dr. Barrow filed for divorce, she opened a new account at Hibernia into which she deposited only amounts collected on these old receivables. She tracked the accounts as long as possible, until April. At this point, she determined that $112,420.85 had been collected.
[7] Dr. Barrow conveniently accepts, however, the benefit of over $50,000 depreciation for furniture and equipment of the medical practice, also listed in the allegedly "inherently inaccurate" compilation.
[8] In its reasons for judgment, the trial court determined that the value of the medical practice was $394,935.55, and simply rounded off to $395,000. In refiguring the value, we have relied upon the former and more precise estimate.
[9] This total in the trial court judgment included the Faulk-Collier debt, which we have reclassified as Dr. Barrow's separate obligation.
[10] This total in the trial court judgment included reimbursement for contributions made to Dr. Barrow's separate tax shelters; we have deleted this reimbursement on appeal.